LIEM DUC NGUYEN, Minh Cong Ha, Kim Chi Thi Lam, Dzu Thuy Do, Tan Huy Nguyen, Vui Van Le, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

The UNITED STATES CATHOLIC CON-FERENCE d/b/a the Southeast Asia Refugee Resettlement Office in Pittsburgh, and Frank Chinh Nguyen, individually and in his capacity as Supervisor and Director of the Southeast Asia Refugee Resettlement Office of Pittsburgh, and Their Agents, Employees, Successors in office, and all other persons acting in Concert or Cooperation with them or at their directions or under their control, Defendants.

Civ. A. No. 81–384.

United States District Court, W.D. Pennsylvania.

Oct. 8, 1982.

Timothy O'Brien, Neighborhood Legal Services, Pittsburgh, Pa., for plaintiffs.

James H. McConomy, Reed Smith Shaw & McClay, Pittsburgh, Pa., for defendants.

## OPINION

MANSMANN, District Judge.

■ This matter is before the Court on a Motion to Dismiss or, in the Alternative, for Summary Judgment[1] filed by Defendant United States Catholic Conference ("Catholic Conference") and Defendant, Frank Chinh Nguyen ("Frank Chinh").[2] Also be-

---

**1.** In their Motion, Defendants allege both a lack of subject matter jurisdiction and a failure to state a claim upon which relief may be granted. A Motion for Summary Judgment, however, is not an appropriate vehicle in which to controvert the Court's subject matter jurisdiction. Wright & Miller, 10 Federal Practice and Procedure § 2713, at 402 (1973). Therefore, Defendants' Motion will be treated as a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(1) with respect to the issue of subject matter jurisdiction. A Motion to Dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) may be converted into a Motion for Summary Judgment upon the submission of matters outside of the pleadings. See Fed.R.Civ.P. 12(b) and 56. Since Defendants submitted an affidavit, which was not excluded by the Court, their Motion will be treated as a Motion for Summary Judgment with respect to the issue of whether Plaintiffs have stated a claim upon which relief may be granted. We note that Plaintiffs were given ample opportunity to file opposing affidavits and to present oral argument. See Crown Central Petroleum Corp. v. Waldman, 634 F.2d 127, 129 (3d Cir. 1980).

**2.** The Catholic Conference and Frank Chinh are jointly represented by counsel. One Motion has been filed on behalf of both.

fore the Court are Plaintiffs' Motion for Leave to Amend Complaint and Plaintiffs' Motion for Class Certification. Plaintiffs, who are Vietnamese refugees, brought this action as a result of Defendants' refusal to provide cash grants and other benefits requested by Plaintiffs for their resettlement in this country. For the reasons set forth below, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is granted.[3]

\* \* \* \* \* \*

■ Dismissal on jurisdictional grounds and for failure to state a claim are analytically distinct, implicating different legal principles and different burdens of proof. *Johnsrud v. Carter*, 620 F.2d 29, 32 (3d Cir. 1980). The former involves the right to be heard in court while the latter is a disposition of the case on the merits. *Id.* at 33.

■ Motions which challenge subject matter jurisdiction may simply attack the facial sufficiency of the Complaint or they may attack the factual existence of subject matter jurisdiction. *Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). In a facial attack, the Court must take the allegations of the Complaint as true.[4] *Id.* Where, however, the Motion creates a factual issue regarding subject matter jurisdiction, " 'no presumptive truthfulness attaches to Plaintiff's allegations and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims. Moreover, the Plaintiff will have the burden of proof that jurisdiction does in fact exist.' "[5] *Enka B.V. of Arnhem, Holland v. E.I. DuPont*

*Nemours & Co.*, 519 F.Supp. 356, 359 (D. Del.1981), quoting *Mortensen, supra* at 891.

■ With a Motion to Dismiss for failure to state a claim, the burden is on the moving party. *Johnsrud v. Carter, supra* at 33. Because a 12(b)(6) Motion results in a determination on the merits at an early stage of Plaintiff's case, the Plaintiff is afforded the safeguard of having all of its allegations taken as true. *Mortensen, supra* at 891. If the court considers matters outside of the pleadings, the Motion is transformed into a Rule 56 Motion for Summary Judgment. *Id.*

Under Fed.R.Civ.P. 56(c), summary judgment may be entered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court of Appeals for the Third Circuit has made clear that any doubts as to the existence of genuine issues of fact are to be resolved against the moving parties. *Continental Ins. Co. v. Bodie*, 682 F.2d 436 at 438 (3d Cir. June 28, 1982); *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir. 1981). Further, the facts and the inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the Motion. *Continental Ins. Co. v. Bodie, supra*, 682 F.2d at 438; *Betz Laboratories, Inc. v. Hines*, 647 F.2d 402, 404 (3d Cir. 1981).

With the above standards in mind, the facts may be summarized as follows:

Plaintiffs are Vietnamese who sought refuge in this country during the 1970s as a

---

**3.** In light of this Court's decision on Defendants' Motion, it is unnecessary to rule on the Motion for Leave to Amend Complaint and the Motion for Class Certification.

**4.** Note, however, that the Plaintiff carries throughout the litigation the burden of showing that he is properly in court. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936).

**5.** If the Plaintiff's allegations of jurisdictional facts are challenged in any appropriate manner, he must support them by competent proof. *Id.* The trial court may inquire, by affidavits or otherwise, into the facts as they exist. *Wetmore v. Rymer*, 169 U.S. 115, 120–121, 18 S.Ct. 293, 295, 42 L.Ed. 682 (1898). "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Gibbs v. Buck*, 307 U.S. 66, 71–72, 59 S.Ct. 725, 728, 83 L.Ed. 1111 (1939).

result of the Vietnam conflict.[6] Plaintiffs were "sponsored" by the Catholic Conference and several were additionally co-sponsored by private individuals. The Catholic Conference is a non-profit agency founded by the Roman Catholic Church in America. It maintains an office in Pittsburgh, Pennsylvania, having its principal place of business in Washington, D.C. One of the functions of the Catholic Conference has been the resettlement of thousands of Indochinese refugees in the United States.

The Catholic Conference, under one name or another, has rendered assistance to refugees since at least 1938. Other voluntary organizations which have rendered assistance to refugees include the United Hebrew Immigrant Aid Society, the Lutheran Immigration and Refugee Service, the Church World Service and the International Rescue Committee. In the past, the United States Government did not provide any funds to defray the costs of these activities. In the 1960's, however, Congress authorized the first appropriation for refugee resettlement assistance. Grant agreements were subsequently executed under which per capita funds were provided to voluntary agencies.

Since 1975, the Catholic Conference and the Department of State have executed a series of "grant agreements" pursuant to the Migration and Refugee Assistance Act of 1962 ("Refugee Act of 1962"), as amended, 22 U.S.C. § 2601 et seq.[7] Under the terms of these agreements, the Catholic Conference is to receive an amount of money at a per capita rate in order to defray the costs incurred in the resettlement of Indochinese refugees.[8] The responsibilities of the Conference under the agreements include (1) pre-arrival services such as providing information to a local sponsor or resettlement office, (2) reception services such as providing a food allowance and temporary accommodations, if necessary, (3) counseling and referral services in the areas of health and employment, and (4) consultation with public agencies which may also offer services to the resettled refugees. The grant agreements provide that the Catholic Conference may also offer optional services to the refugees such as arranging grants or loans for their emergency needs. The agreements further state that the funds awarded thereunder shall be used not only to defray costs directly attributable to the resettlement of the refugees, but shall also be used to cover justifiable overhead costs of the Catholic Conference.

Most of the Plaintiffs have resided in Pittsburgh since 1975 or 1979 [9] and have therefore dealt with the Conference's Pittsburgh office.[10] Defendant Frank Chinh was formerly employed as the Supervisor of the Pittsburgh office and is presently serving as its Director.

Plaintiffs contend that the Catholic Conference's Pittsburgh Office failed to ensure that they were provided with the "basic essentials of life." Specifically, Plaintiffs assert that it was the practice of the Catholic Conference in the past to give individual refugees the unused portion of the $500 per capita grant.[11] Plaintiffs, however, main-

---

**6.** Plaintiffs Liem Duc Nguyen, Tan Huy Nguyen and Dzu Thuy Do came to the United States in 1975. Plaintiffs Minh Cong Ha, and Vui Van Le came to the United States in 1979. The pleadings do not provide a date of arrival for Plaintiff Kim Chi Thi Lam but the record suggests that she arrived in 1980.

**7.** The Refugee Act of 1962 provided, inter alia, for aid to Cuban refugees. The Indochina Migration and Refugee Assistance Act of 1975, as amended in 1976, provided for assistance to Cambodian, Laotian and Vietnamese refugees in accordance with the provisions of the 1962 Act. These Acts were further amended by the Refugee Act of 1980. Hereinafter, all of these Acts are collectively referred to as the "Refugee Acts."

**8.** According to Plaintiffs, the per capita rate is $500.

**9.** Plaintiff Kim Chi Thi Lam has lived in Pittsburgh since 1980.

**10.** The Pittsburgh office was formerly called the Southeast Asian Refugee Resettlement Office ("SEARRO"). According to Plaintiffs' Motion for Leave to Amend Complaint, SEARRO is now called the Refugee Resettlement Office ("RRO").

**11.** The "unused portion," according to Plaintiffs, is that amount remaining after payment of actual resettlement costs. Plaintiffs maintain that such costs are usually about $200 to $250 per person.

tain that they did not receive the money to which they were allegedly entitled.[12] As a result, Plaintiffs were allegedly deprived of basic necessities. Plaintiffs further contend that the Catholic Conference has acted in an arbitrary and capricious manner by awarding monetary grants to some refugees and not to others.

Plaintiffs brought the present suit as a class action on behalf of all Indochina refugees residing in the Western District of Pennsylvania.[13] Plaintiffs allege that they were denied equal protection as well as substantive and procedural due process under the Fifth Amendment to the United States Constitution. They also allege a denial of rights under the Refugee Acts, 22 U.S.C. § 2601. Further, Plaintiffs allege that Defendants have breached their contract(s) with the Department of State, of which Plaintiffs are allegedly third-party beneficiaries. Plaintiffs seek injunctive relief as well as the payment of all monies wrongfully withheld. They predicate this Court's jurisdiction upon 28 U.S.C. §§ 1331 and 1361.[14]

Defendants have filed a Motion to Dismiss or, in the alternative, for Summary Judgment, alleging both lack of subject matter jurisdiction and failure to state a claim under 28 U.S.C. §§ 1331 and 1361.[15] Their specific arguments are set forth *infra*.

\*    \*    \*    \*    \*    \*

## I. CLAIM FOR MANDAMUS UNDER 28 U.S.C. § 1361

Defendants contend that this Court has no subject matter jurisdiction over Plaintiffs' claim for mandamus because the Catholic Conference is not a federal agency nor is Frank Chinh a federal employee or officer. Lack of these prerequisites allegedly deprives the Court of jurisdiction to hear this claim. Plaintiffs concede that Defendants are not federal agencies or officers. They argue, however, that Defendants are engaged in federal action which, according to Plaintiffs, is sufficient to establish jurisdiction under 28 U.S.C. § 1361.

Both Defendants and Plaintiffs rely upon *Griffith v. Bell-Whitley Community Action Agency,* 614 F.2d 1102 (6th Cir. 1980), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3025, 65 L.Ed.2d 1122 (1980), in support of their arguments. In that case, the United States Court of Appeals for the Sixth Circuit held that there was no subject matter jurisdiction to hear a claim for mandamus under § 1361 where the Defendant, a community action agency, was not a federal agency and where its employees were not officers or employees of the United States. The Court made clear in *Griffith* that the federal agency and federal employee elements are essential to a mandamus action. *Id.* at 1106.

**12.** With respect to each of the named Plaintiffs: (1) Plaintiff Liem Duc Nguyen received $288 for rent and security deposit. He also obtained three jobs through the Catholic Conference. (2) Plaintiff Minh Cong Ha was not reimbursed for a $429 television set which he purchased. The record does not indicate whether he received any financial assistance or other services. (3) Plaintiff Kim Chi Thi Lam received $790.41 for herself, one sister and two brothers. (4) Plaintiff Tan Huy Nguyen received no financial assistance from the Conference's Pittsburgh office. (5) Plaintiff Dzu Thuy Do also received no financial assistance from the Conference's Pittsburgh office. (6) Plaintiff Vui Van Le was not reimbursed for a $210 radio cassette and a $75 watch which he purchased nor was he provided with other financial assistance from the Pittsburgh office.

**13.** Plaintiffs Liem Duc Nguyen, Minh Cong Ha and Kim Chi Thi Lam filed the Complaint on March 12, 1981. An Amended Complaint, filed on June 26, 1981, added Dzu Thuy Do, Tan Huy Nguyen and Vui Van Le as Plaintiffs. Plaintiffs now seek to file a Second Amended Complaint in their Motion for Leave to Amend Complaint.

**14.** 28 U.S.C. § 1331 provides:
§ 1331. Federal Question
The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.
28 U.S.C. § 1361 provides:
§ 1361. Action to compel an officer of the United States to perform his duty.
The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

**15.** *See* n. 1.

■ The Court in *Griffith* also discussed the distinction between federal control and federal action. The Court found that the control element is relevant in mandamus actions to the jurisdictional question of whether the Defendant is a federal agency or federal employee. *Id. See also United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (The existence of federal control is determinative of the question of whether a community action agency is a federal agency and its employees are federal employees under the Federal Tort Claims Act). Federal action, however, may exist regardless of whether or not federal control is present. The absence of federal control, necessary for jurisdiction in a mandamus action, does not preclude the existence of federal action which could support a constitutional claim. *Id.* at 1107. Hence, the existence of federal action does not establish jurisdiction under § 1361.

■ Accordingly, this Court finds that it lacks subject matter jurisdiction with respect to Plaintiffs' claim for mandamus.[16]

\* \* \* \* \* \*

## II. CLAIM UNDER THE FIFTH AMENDMENT

### A.

■ Defendants assert that this Court is without jurisdiction under the Fifth Amendment because the claim does not arise under the United States Constitution within the meaning of 28 U.S.C. § 1331. Specifically, Defendants maintain that they have not engaged in federal action which,

according to their argument, is necessary for subject matter jurisdiction.

Plaintiffs respond that this Court does have jurisdiction under § 1331. They contend that the presence or absence of federal action is not relevant to subject matter jurisdiction. Rather, according to Plaintiffs, the existence of federal action relates to the question of whether Plaintiffs have stated a claim upon which relief may be granted.

The United States Supreme Court in *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) stated:

> Before deciding that there is no jurisdiction, the District Court must look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and laws of the United States ... (W)here the Complaint ... is ... drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions ... must entertain the suit. 327 U.S. at 681–682, 66 S.Ct. at 775.[17]

We agree with Plaintiffs that the existence of federal action is not relevant to the threshold inquiry of subject matter jurisdiction. Thus, the presence or absence of federal action depends on the facts of the case and must be decided after the Court has assumed jurisdiction over the controversy. *See Griffith v. Bell-Whitley Community Action Agency, supra* at 1107. Such a determination goes to the merits of the case and calls for us to decide whether Plaintiffs

---

**16.** Assuming *arguendo* that there is subject matter jurisdiction, Plaintiffs have failed to state a claim for mandamus. In this regard, mandamus may not issue unless it is shown that an officer of the government owes Plaintiff a clear, ministerial and nondiscretionary duty. *See Mattern v. Weinberger*, 519 F.2d 150 (3d Cir. 1975), *cert. denied sub nom. Califano v. Mattern*, 443 U.S. 912, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979). As will be discussed *infra*, neither the Fifth Amendment, the Refugee Acts, nor the contracts with the Department of State obligate Defendants to provide cash grants to the Plaintiffs.

**17.** The two exceptions which can defeat jurisdiction are "where the alleged claim ... clearly

appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." 327 U.S. at 682–683, 66 S.Ct. at 776.

Defendants do not assert that Plaintiffs have alleged insufficient facts to support jurisdiction or that their claim is immaterial or frivolous. Indeed, in this regard it cannot be said that Plaintiffs have alleged insufficient facts or that their constitutional claim is " '*so patently without merit* as to justify ... the court's dismissal for want of jurisdiction.' " *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 70, 98 S.Ct. 2620, 2628, 57 L.Ed.2d 595 (1978), quoting *Bell v. Hood, supra* at 683, 66 S.Ct. at 776.

have stated a proper cause of action. *Id.* *See also Bell v. Hood, supra* at 682, 66 S.Ct. at 776.

### B.

■ Defendants allege that there can be no violation of the Fifth Amendment because their conduct does not constitute federal action. Specifically, they argue that they do not have a "symbiotic relationship" with the federal government nor do their activities have such a close nexus with the federal government that they may be treated as the actions of the government. Defendants further argue that even if federal action exists, they have not violated the due process and equal protection clauses of the Fifth Amendment.

Plaintiffs allege that they were denied rights guaranteed by the due process and equal protection clauses of the Fifth Amendment.[18] They agree that the challenged activity must constitute federal action in order for the Fifth Amendment to apply. At oral argument, Plaintiffs argued that the private Defendants perform a function so public in nature as to render their activities federal action. In their briefs, Plaintiffs also argue that a symbiotic relationship exists between the private Defendants and the federal government. In addition, they argue that a sufficiently close nexus exists between the Defendants and the government such that the activities of the former may be treated as those of the latter.

It is axiomatic that the strictures of the Fifth Amendment are applicable only to the actions of the federal government and not to those of private persons. *Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952). The United States Supreme Court has developed several tests to determine the existence of government action.[19] We turn now to each of the tests and examine closely the facts in light of those tests.

### 1. THE "SYMBIOTIC RELATIONSHIP" TEST

Under the "symbiotic relationship" test articulated by the Court in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), government action may be found where "(t)he State has so far insinuated itself into a position of interdependence with ... (the Defendants) that it must be recognized as a joint participant in the challenged activity ...". *Id.* at 725, 81 S.Ct. at 861.[20]

Cases decided by the United States Court of Appeals for the Third Circuit have emphasized that under *Burton,* a "symbiotic relationship" may be established by showing the government's extensive involvement

---

**18.** The Fifth Amendment provides in pertinent part: "No person shall be ... deprived of life, liberty, or property, without due process of law ...".

Although the Fifth Amendment contains no equal protection clause, the United States Supreme Court has held that "the Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.'" *Rostker v. Goldberg,* 453 U.S. 57, 89 n. 6, 101 S.Ct. 2646, 2653 n. 6, 69 L.Ed.2d 478 (1981) (Marshall, J., dissenting opinion), quoting *Schlesinger v. Ballard,* 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 574 n. 3, 42 L.Ed.2d 610 (1975).

**19.** The standards used to determine whether conduct is federal action subject to the Fifth Amendment are identical to those used to determine whether conduct is state action subject to the Fourteenth Amendment. *Warren v. Government Nat'l Mortgage Ass'n,* 611 F.2d 1229, 1232 (8th Cir. 1980), *cert. denied,* 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980).

**20.** In *Burton v. Wilmington Parking Authority, supra,* a restaurant located in a publicly-owned parking facility refused service to a black. The Court found sufficient state action so as to invoke the Fourteenth Amendment where the land and building housing the restaurant were publicly-owned, rent from the restaurant contributed to the support of the garage while most of the remaining maintenance costs were financed by the public, the building was devoted to a public use and most importantly, the particular relationship between the restaurant and the garage conferred mutual benefits on both. *Id.* at 723–724, 81 S.Ct. at 860. Thus, the State effectively not only made itself a party to the restaurant's discriminatory act, but "elected to place its power, property and prestige behind the admitted discrimination." *Id.* at 725, 81 S.Ct. at 861.

and interdependence with the private party. *See e.g. Hollenbaugh v. Carnegie Free Library,* 545 F.2d 382, 385 (3d Cir. 1976), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978). The dispositive factor in *Burton* with respect to the state action issue was the "extent and nature of the overall relationship between the state and the private enterprise." *Braden v. University of Pittsburgh,* 552 F.2d 948, 957 (3d Cir. 1977). The establishment of an "inextricably-linked" relationship [21] renders the government a joint participant in the challenged activity, obviating the need for the Plaintiff to show state involvement in the specific action being challenged.[22] *Hollenbaugh v. Carnegie Free Library, supra* at 385.

The facts presented before us do not establish federal action under the *Burton* test.

It is undisputed that the Catholic Conference is a private organization and that Frank Chinh is a private individual. There is no evidence that Frank Chinh or any other employee or officer of the Catholic Conference is appointed by the government. *Cf. Hollenbaugh v. Carnegie Free Library, supra* at 385 (A majority of the Defendants' trustees were appointable by government bodies). There is also no evidence that the Catholic Conference's headquarters, or its Pittsburgh office, are located in a publicly-owned building.[23] *See Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 175, 92 S.Ct. 1965, 1972, 32 L.Ed.2d 627 (1972); *Burton v. Wilmington Parking Authority, supra* at 723–724, 81 S.Ct. at 860.

 The record does not indicate that the Catholic Conference is subject to pervasive federal regulation.[24] Participation by

local dioceses in the refugee resettlement program is purely voluntary. Further, the majority of the refugee resettlement services listed in the grant agreements are optional. It appears that the greatest areas of government involvement are those of auditing and fiscal reporting with respect to the expenditure of the grants by voluntary agencies.

The record also shows that the Catholic Conference does not derive a large portion of its revenue from the government. *Cf. Chalfant v. Wilmington Institute, supra* at 745 (Defendant derived over 90 per cent of its revenues from the government). According to the affidavit of Donald G. Hohl, Assistant Director for Migration and Refugee Services of the Catholic Conference, funds are donated by private individuals and businesses. In addition, parish resettlement programs are heavily supported by collection monies from parishioners.

The Catholic Conference, under various names, has been aiding refugees since at least 1938. Only since 1975 has it received monies from the federal government to help defray the costs incurred in the resettlement of Indochinese refugees. Further, the government funds received by the Conference defray only a portion of its costs. We note that the actual per capita cost of resettlement is roughly twice the per capita amount received under the grant agreements.

As in *Rendell-Baker v. Kohn,* —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the fiscal relationship between the Catholic Conference and the government "is not different from that of many contractors performing services for the government." ——

---

**21.** *Braden v. University of Pittsburgh, supra* at 958.

**22.** The "nexus" test set forth in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), should be applied only if the requisite state involvement and interdependence is not found under the *Burton* test. *Chalfant v. Wilmington Institute,* 574 F.2d 739, 745–746 (3d Cir. 1978).

**23.** The Catholic Conference's principal place of business is located at 1312 Massachusetts Ave-

nue, N.W., Washington, D.C. 20005. The Pittsburgh office is located in the Jenkins Arcade Building at Fifth and Liberty Avenues, Pittsburgh, Pennsylvania 15219.

**24.** Standing alone, heavy governmental regulation does not necessarily give rise to a *Burton* "symbiotic relationship" so as to warrant a finding of government action. *See Fitzgerald v. Mountain Laurel Racing, Inc.,* 607 F.2d 589, 594–596 (3d Cir. 1979), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980).

U.S. at ——, 102 S.Ct. at 2770. Moreover, " 'receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government.' " *Hollenbaugh v. Carnegie Free Library, supra* at 385, quoting *Grossner v. Trustees of Columbia Univ.*, 287 F.Supp. 535, 547–548 (S.D.N.Y.1968).

Finally, the fact that the Catholic Conference's historically traditional activities may advance policies now espoused by the United States government does not transform Conference activities into federal action. The relationship between the two does not make the federal government a joint venturer with the Conference nor can it be said that every act of the Conference is an act of the United States.

Thus, given the record before us, it cannot be said that a "symbiotic relationship" exists between the Catholic Conference and the government such as existed in *Burton.*

### 2. THE "NEXUS" TEST

Under the "nexus" test established by the Court in *Jackson v. Metropolitan Edison Co., supra,* government action may be found if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453.[25]

█ Under *Jackson,* the Plaintiff must show that the government is so involved in the specific act at issue that it has effectively placed its imprimatur on that act or put its weight behind it. *See Jackson v. Metropolitan Edison Co., supra* at 357, 95 S.Ct. at 456; *Fitzgerald v. Mountain Laurel Racing, Inc., supra* at 597. The government's mere acquiescence or approval of the private action does not convert the act into that of the government. *See Blum v. Yaretsky,* —— U.S. ——, ——, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). *See also Flagg Bros. v. Brooks,* 436 U.S. 149, 164, 98 S.Ct. 1729, 1737, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co., supra* at 357, 95 S.Ct. at 456.

Thus, the government can be held responsible for the private act only when it has compelled the act by law[26] or when it has "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky, supra,* —— U.S. at ——, 102 S.Ct. at 2785.

At oral argument, Plaintiffs relied heavily upon the decision of the United States Court of Appeals for the Second Circuit in *Yaretsky v. Blum,* 629 F.2d 817 (2d Cir. 1980). That decision, however, was recently reversed by the United States Supreme Court. *See Blum v. Yaretsky, supra.*

In *Blum,* the Plaintiffs were patients in a private nursing home who received Medicaid assistance from the State of New York. A committee of outside physicians, established by the nursing home, determined that the Plaintiffs should be transferred to a facility which provided a lower level of care. New York City officials, who administered the Medicaid program in the City, were notified of the committee's decision and prepared to reduce or terminate payments to the nursing home for Plaintiffs' care. The Plaintiffs sued state officials alleging, *inter alia,* that the committee's actions violated their rights of due process under the Fourteenth Amendment. The District Court found the existence of state action without explaining its reasons. —— U.S. at ——, 102 S.Ct. at 2781. The Court of Appeals affirmed that portion of the

---

**25.** A close nexus between the government and the challenged private action may be sufficient to warrant a finding of federal action even if a *Burton* "symbiotic relationship" is absent. *See Fitzgerald v. Mountain Laurel Racing, Inc., supra* at 596–597,

**26.** *Flagg Bros. v. Brooks, supra* at 164, 98 S.Ct. at 1737. *See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26

L.Ed.2d 142 (1970). The Court in *Adickes* noted that " '(w)hen the State has commanded a particular result, it has saved to itself the power to determine that result and thereby to a significant extent has become involved in it.' " *Id.,* quoting *Peterson v. City of Greenville,* 373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963).

District Court's judgment, finding that all transfers initiated by nursing homes, attending physicians or committees of outside physicians, under these facts, involve state action. —— U.S. at ——, 102 S.Ct. at 2783. The Court determined that a sufficiently close nexus was established, within the meaning of *Jackson,* between the State and the nursing homes or the physician committees. The Court predicated its determination upon the government's adjustment of the patients' Medicaid benefits in response to the committee's decision. *Id.*

The United States Supreme Court reversed, holding that the Plaintiffs failed to establish state action in the decisions to transfer Medicaid patients to lower levels of care. The Court stated that these decisions are made by private parties according to professional standards which are not established by the State. —— U.S. at ——, 102 S.Ct. at 2787. The relevant federal and state regulations do not dictate the decision to discharge or transfer in a particular case. While state officials review Medicaid forms filed by the nursing homes, nothing in the regulations authorizes the officials to approve or disapprove decisions to transfer. —— U.S. at ——, 102 S.Ct. at 2788. The Court further stated that adjustments in benefit levels in response to a decision to discharge do not constitute approval or enforcement of that decision. *Id.* Therefore, the Court concluded that the government's degree of involvement in the private decisions to transfer was insufficient under *Jackson* to hold the State responsible for those decisions. *Blum v. Yaretsky, supra.*

As in *Blum,* the government does not dictate the decisions behind the actions here in controversy. Specifically, the government does not direct whether or not the "unused" portion of a per capita grant should be paid directly to an individual refugee. Indeed, the government provides relatively little guidance as to how the funds should be spent by the Conference on an individual basis.

The grant agreements advise the grantee generally as to those services it is expected to perform and those services it may perform. Nothing in the agreements requires the grantee to pay individual refugees "unused" portions of the per capita grants. It cannot even be said that the grant agreements provide "significant encouragement" to such payments. *See Blum v. Yaretsky,* —— U.S. at ——, 102 S.Ct. at 2783. In this regard, no mention is made in the contracts of the "unused" portions of the per capita grants. As noted earlier, the grant agreements expressly recognize that the funds awarded thereunder shall be used to cover "justifiable overhead costs" of the grantee as well as to defray expenses directly attributable to the resettlement refugees.[27] This language indicates that any per capita grant, or any portion thereof, may in fact be used for a purpose unrelated to the immediate needs of a particular refugee.[28]

Further, Plaintiffs can point to no statutory or regulatory provision which requires or strongly encourages the payment of any "unused" portion of a per capita grant. Plaintiffs' references to the Refugee Acts in this regard are vague and generalized. Rights allegedly conferred by the Acts cannot be attributed to any specific provision nor can it fairly be said that the alleged rights are created by the Acts as a whole.

Finally, the record indicates that the government has expressly refuted any alleged requirement that portions of per capita grants are to be paid directly to individual refugees.[29]

---

**27.** *See* Exhibit A to Plaintiffs' Amended Complaint (the grant agreement in effect at the time Plaintiffs filed suit).

**28.** The use of a "per capita grant" system is a convenient method of calculating the amount of money to award voluntary agencies in order to help mitigate their expenses. The use of a per capita rate does not create an entitlement or right in the individual refugee to the amount of that rate, whether in services, money or a combination thereof. Likewise, the use of the per capita system does not render the government responsible for the decisions of private parties, such as the Catholic Conference, in spending monies received thereunder.

**29.** Donald Hohl's affidavit refers to a statement issued by the Department of State on February 24, 1976, which explains the government's po-

Given the facts presented here, we can find no nexus between the government and the actions of the Defendants with respect to the direct payment of portions of per capita grants to individual refugees. Thus, the decisions regarding such payments are made by voluntary agencies and are not the decisions of the government. *See Griffith v. Bell-Whitley Community Action Agency, supra* at 1109. At best, the government has merely acquiesced in the decisions by these private organizations to make or not to make direct payments. *See Blum v. Yaretsky, supra* —— U.S. at ——, 102 S.Ct. at 2783.

### 3. THE "PUBLIC FUNCTION" TEST

Finally, under the "public function" test [30] discussed by the Court in the recent case of *Rendell-Baker v. Kohn*, —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) and also in the earlier case of *Jackson v. Metropolitan Edison Co., supra,* government action may be present where the function performed by the private entity was " 'traditionally the exclusive prerogative of the State.' " *Rendell-Baker v. Kohn, supra* —— U.S. at ——, 102 S.Ct. at 2773, quoting *Jackson v. Metropolitan Edison Co., supra* at 353, 95 S.Ct. at 454.

The performance of a function which serves the public or which is "affected with a public interest" does not suffice under this test. *Rendell-Baker v. Kohn, supra,* —— U.S. at ——, 102 S.Ct. at 2771; *Jackson v. Metropolitan Edison Co., supra* at 353–354, 95 S.Ct. at 454. Rather, the activity must be one which is traditionally associated with sovereignty. *Id.* at 353, 95 S.Ct. at 454.

There are no facts to support the proposition that the resettlement of refugees has traditionally been within the *exclusive* province of the government. Indeed, the facts suggest quite the contrary.

With respect to this particular case, the government began to assist in the resettlement of refugees only in the 1960s. Even then, the government's participation has been limited to the award of monetary grants to defray the expenses of private organizations. It is these volunteer organizations which have performed the actual work of assisting refugees for decades without governmental direction or monetary help. The Conference, in one form or another, has been assisting refugees since at least 1938. And we note, with emphasis, that it is only *one* of *many* private organizations which have performed voluntary services in this area without governmental subsidy.

Plaintiffs have offered no facts which would establish the existence of federal action under the public function test. That Defendants' services may further government policies does nothing more than clothe their activities "with a public use." *See Jackson v. Metropolitan Edison Co., supra* at 353–354, 95 S.Ct. at 454. Thus, Defendants' activities are not the exercise of powers which have traditionally been exercised exclusively by the government. *Cf. Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (Control and maintenance of a public park).

■ Plaintiffs have failed to establish "federal action" under any of the tests discussed above. Consequently, Plaintiffs are unable to prove that Defendants have violated rights secured by the Fifth Amendment.[31]

\*　　\*　　\*　　\*　　\*　　\*

sition with regard to the direct payment of money to individual refugees:

> Although some of the voluntary and the State and local agencies have, in fact, provided direct payment of money to refugees, there is no requirement that this be done. The fact of the matter is that no refugee is entitled to a total of $500 or to any specific amount of direct financial assistance. Affidavit of Donald Hohl, para. 15.

Plaintiffs do not dispute the issuance or contents of this statement.

**30.** Plaintiffs refer to this test as the "entanglement concept" in their original brief.

**31.** Assuming *arguendo* that federal action was found to exist, Plaintiffs have failed to meet the second element necessary to establish a violation of due process under the Fifth Amendment. Specifically, Plaintiffs have not demon-

## III. CLAIM UNDER THE REFUGEE ACTS

### A.

■ Defendants assert that this Court is without subject matter jurisdiction over Plaintiffs' claim under the Refugee Acts, 22 U.S.C. § 2601 *et seq.* They argue that this claim does not arise under the laws of the United States because it does not involve a dispute over the interpretation of a federal statute.

Plaintiffs contend that their statutory claim does arise under the laws of the United States because they have raised the issue of whether the Refugee Acts confer the right upon individual refugees to portions of the per capita grants.

We agree with the Plaintiffs that they have presented a claim "arising under the ... laws ... of the United States" within the meaning of 28 U.S.C. § 1331. Thus, their Complaint was drawn so as to seek recovery directly under the Refugee Acts as well as under the grant agreements. Unlike *Hines v. Cenla Community Action Comm., Inc.,* 474 F.2d 1052 (5th Cir. 1973), cited by Defendants, this case does not in-

volve private contractual rights alone. *Id.* at 1056. Rather, the controversy between the parties in the instant case does require the interpretation of a federal statute. Although Plaintiffs' Complaint did not allege the violation of a specific statutory provision, we believe that sufficient facts have been alleged to support our exercise of subject matter jurisdiction. Further, it cannot be said that Plaintiffs' statutory claim is "so patently without merit" as to justify its dismissal for lack of subject matter jurisdiction. *See* n. 17. *See generally Clark v. Gulf Oil Corp.,* 570 F.2d 1138 (3d Cir. 1977), *cert. denied sub nom. Philadelphia Gas Works v. Gulf Oil Corp.,* 435 U.S. 970, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978).

Accordingly, this Court does have jurisdiction to determine whether Plaintiffs have stated a claim for relief under the Refugee Acts.

### B.

Defendants contend that Plaintiffs have no private right of action under the Refugee Acts because those Acts do not mandate or prohibit any activities.[32] Rather, the

---

strated that they have been deprived of protected liberty or property interests. *See Greenholtz v. Inmates of the Nebraska Penal and Correction Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979).

The standards used to determine the existence of a protected property interest under the Fifth Amendment are identical to those used under the Fourteenth Amendment. *See generally Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), *rehearing denied,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974). Thus, "(t)o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A claim of entitlement is not created by the Constitution. *Id.* Rather, it is created by an independent source such as rules, laws or explicit understandings promulgated and fostered by government officials. *Perry v. Sinderman,* 408 U.S. 593, 601–602, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

As already discussed, neither the use of a "per capita" system nor the grant agreements themselves support a claim of entitlement on the part of individual refugees to "unused"

portions of per capita grants. Indeed, the government has expressly repudiated such a claim of entitlement. *See* n. 28. The Refugee Acts also lend no support for such a claim. As noted earlier, Plaintiffs can offer no statutory provision which even suggests the entitlement claimed by them.

Further, Plaintiffs have not established that they were deprived of equal protection under the Fifth Amendment. Thus, Plaintiffs have not shown that they were provided "dissimilar treatment" from others "similarly situated." *See Schlesinger v. Ballard,* 419 U.S. 498, 506–507, 95 S.Ct. 572, 576, 42 L.Ed.2d 610 (1975) (Sex discrimination). For example, there is no evidence that the individuals named by Plaintiffs as having allegedly received money from the Conference—Nguyen Van Oanh, Nguyen Van Dong and Duong Thanh Ton—were in circumstances similar to their own.

**32.** The Refugee Acts provide in pertinent part:
§ 2601
(a) The President is authorized to continue membership for the United States in the Intergovernmental Committee for European Migration in accordance with its constitution approved in Venice, Italy, on October 19, 1953. For the purpose of assisting in the

Acts, according to Defendants, are no more than appropriation bills. Therefore, they argue that the factors enumerated by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), are not relevant to the instant case.

Plaintiffs argue that *Cort v. Ash* is applicable to this case and that an analysis under the *Cort v. Ash* standards shows that the Refugee Acts do confer a private right of action upon them.

We agree with Plaintiffs that the factors set forth in *Cort v. Ash* are relevant to this case but find, upon application of those factors, that Plaintiffs do not have a private right of action under the Refugee Acts.

■ The violation of a federal statute and the resulting harm to an individual does not automatically give rise to a private cause of action in favor of the injured per-

movement of refugees and migrants and to enhance the economic progress of the developing countries by providing for a coordinated supply of selected manpower, there are authorized to be appropriated such amounts as may be necessary from time to time for the payment by the United States of its contributions to the Committee and all necessary salaries and expenses incident to the United States participation in the Committee.

(b) There are authorized to be appropriated such amounts as may be necessary from time to time—

(1) for contributions to the activities of the United Nations High Commissioner for Refugees for assistance to refugees under his mandate or persons on behalf of whom he is exercising his good offices, and for contributions to the Intergovernmental Committee for European Migration, the International Committee of the Red Cross, and to other relevant international organizations; and

(2) for assistance to or on behalf of refugees who are outside the United States designated by the President (by class, group, or designation of their respective countries of origin or areas of residence) when the President determines that such assistance will contribute to the foreign policy interests of the United States.

(c)(1) Whenever the President determines it to be important to the national interest he is authorized to furnish on such terms and conditions as he may determine assistance under this chapter for the purpose of meeting unexpected urgent refugee and migration needs.

(2) There is established a United States Emergency Refugee and Migration Assistance Fund to carry out the purposes of this section. There is authorized to be appropriated to the President from time to time such amounts as may be necessary for the fund to carry out the purposes of this section, except that no amount of funds may be appropriated which, when added to amounts previously appropriated but not yet obligated, would cause such amounts to exceed $50,000,000. Amounts appropriated hereunder shall remain available until expended.

(3) Whenever the President requests appropriations pursuant to this authorization

he shall justify such requests to the Committee on Foreign Relations of the Senate and to the Speaker of the House of Representatives, as well as to the Committees on Appropriations.

Information to Congressional Committees

(d) The President shall keep the appropriate committees of Congress currently informed of the use of funds and the exercise of functions authorized in this chapter.

Continued availability of certain funds

(e) Unexpected balances of funds made available under authority of the Mutual Security Act of 1954, as amended, and of the Foreign Assistance Act of 1961, as amended, and allocated or transferred for the purposes of sections 405(a), 405(c), 405(d) and 451(c) of the Mutual Security Act of 1954, as amended, are authorized to be continued available for the purposes of this section and may be consolidated with appropriations authorized by this section.

Pub.L. 87–510, § 2, June 28, 1962, 76 Stat. 121; Pub.L. 88–634, Title II, § 201, Oct. 7, 1964, 78 Stat. 1021; Pub.L. 94–141, Title V, § 501(a), Nov. 29, 1975, 89 Stat. 771.

§ 2602

(a) In carrying out the purpose of this chapter, the President is authorized—

(1) to make loans, advances, and grants to, make and perform agreements and contracts with, or enter into other transactions with, any individual, corporation, or other body of persons, government or government agency, whether within or without the United States, and international and intergovernmental organizations;

(2) to accept and use money, funds, property, and services of any kind made available by gift, devise, bequest, grant, or otherwise for such purposes.

(b) Whenever the President determines it to be in furtherance of the purposes of this chapter, the functions authorized under this chapter may be performed without regard to such provisions of law (other than the Renegotiation Act of 1951), as amended, regulating the making, performance, amendment, or modification of contracts and the expenditure of funds of the United States Government as the President may specify.

son. *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). The question of whether a statute expressly or impliedly creates a cause of action is a matter of statutory construction. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). The crucial issue to be determined by the court is whether Congress intended to create the private remedy asserted. *Id.* at 15–16, 100 S.Ct. at 245.

In *Cort v. Ash, supra* at 78, 95 S.Ct. at 2087, the Supreme Court described four factors for courts to consider when determining whether private rights of action are implicit in statutes that do not expressly provide for them.

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
>
> (Citations omitted).

Each of these factors is not entitled to equal weight. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979). The factors traditionally relied upon in determining legislative intent are the language and focus of the statute, its legislative history and its purpose. *Id.* at 575–576, 99 S.Ct. at 2489. *See also Lechtner v. Brownyard,* 679 F.2d 322 at 327 (3d Cir. 1982) (Congressional intent to be gleaned from the language and structure, the legislative history and the circumstances surrounding the enactment of the statute at issue). The Court of Appeals for the Third Circuit has indicated that the third and fourth factors articulated in *Cort v. Ash* are relevant only if the first two suggest that Congress intended to create a remedy. *Patentas v. United States,* 687 F.2d 707, 711 (3d Cir. 1982).

■ It is uncontroverted in this case that the Refugee Acts do not expressly create a private cause of action. The Acts, by their terms, grant no private rights to any identifiable class and proscribe no conduct as unlawful. *See Touche Ross & Co. v. Redington, supra* 442 U.S. at 576, 99 S.Ct. at 2489. Further, Plaintiffs admit that the legislative history is silent on the issue of private remedies under the Refugee Acts.[33]

We note that the immediate beneficiaries of the Refugee Acts are the voluntary agencies and organizations who use the funds provided by the government to mitigate their own costs. The fact that the Refugee Acts are designed to confer benefits ultimately upon refugees does not create a private right of action on their behalf. *See Transamerica Mortgage Advisors, Inc. v. Lewis, supra* at 24, 100 S.Ct. at 249; *Touche Ross & Co. v. Redington, supra* 442 U.S. at 578, 99 S.Ct. at 2496.

Since there is no suggestion in the language of the Acts or in the legislative history of a private right of action on the part of

---

**33.** An examination of the language and legislative history reveals that much of the focus of the Refugee Acts is on the appropriation of funds to the President and on the President's authority with respect to the expenditure of those funds. *See* 22 U.S.C. §§ 2601 and 2602.

For example, the Senate Report on the 1962 Act notes, *inter alia,* that the proposed bill "contains authority for the President to delegate his responsibilities under it to appropriate officers of the U.S. Government, to allocate funds to such officers to operate the programs, and to expend funds for necessary operating and administrative purposes." S.Rep.No.989, 87th Cong., 2d Sess., *reprinted in* (1962) U.S. Code Cong. & Ad.News 1791, 1792.

The Senate Report on the 1980 Act mentions, *inter alia,* that "(t)he bill has ... been amended to continue the 'special project' funds currently authorized in the ... Act of 1975, to provide up to $40 million annually 'for special projects and programs, administered primarily by private, non-profit agencies participating in refugee resettlement programs, or by State or local public agencies ...' ". S.Rep.No.96–256, 96th Cong., 2d Sess., *reprinted in* (1980) U.S.Code Cong. & Ad.News 141, 152.

the refugees, our inquiry ends here. *See Touche Ross, supra* at 576, 99 S.Ct. at 2489; *Patentas v. United States, supra,* 687 F.2d at 711.

Therefore, in light of the above, we are unable to find that Plaintiffs have a cause of action under the Refugee Acts.[34]

\* \* \* \* \* \*

## IV. CLAIM UNDER THE GRANT AGREEMENTS

■ Defendants assert that Plaintiffs are not third-party beneficiaries of the contracts between the Catholic Conference and the Department of State. They further maintain that even if Plaintiffs are considered third-party beneficiaries, they have not shown a breach of those contracts.[35]

Plaintiffs argue that they are intended beneficiaries of the grant agreements and that the Catholic Conference has breached its contractual obligations under those agreements.

The Restatement of Contracts sets forth the rule of law with respect to beneficiaries of government contracts:

A promisor bound to the United States or to a state or municipality by contract to to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless,

(a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its

formation, that the promisor shall compensate members of the public for such injurious consequences, or

(b) the promisor's contract is with a municipality to render services the nonperformance of which would subject the municipality to a duty to pay damages to those injured thereby.

Restatement of Contracts, § 145 at 173 (1932).

The more recent rule eliminates the distinction between municipal contracts and other government contracts. *See* Restatement of Contracts Second, § 313 at 472 (1981).

■ In general, "(g)overnment contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." *Id.* at "Comment." Something more than mere intent to benefit some third party must be shown for the third party to have actionable rights under the contract. *Pennsylvania v. National Ass'n of Flood Insurers,* 378 F.Supp. at 1347–1348. There must be language evincing an intent that the party contracting with the government will be held liable to third parties in the event of nonperformance. *Id. See also Schell v. National Flood Insurers Ass'n,* 520 F.Supp. 150, 157 (D.Colo.1981). Otherwise, the third parties are merely incidental beneficiaries having no actionable rights under the contract. The fact that third parties will benefit more directly from performance of the contract than members of the public at large does not alter their status as incidental beneficiaries. *Id.*

---

**34.** Assuming *arguendo* that a private right of action exists, Plaintiffs have not established that Defendants violated the Refugee Acts by failing or refusing to fully pay Plaintiffs the "unused" portions of per capita grants. There is no statutory provision which mandates such action.

**35.** Defendants also suggest that this Court lacks subject matter jurisdiction over the claim under the grant agreements. We reject such a proposition. The grant agreements were executed pursuant to authority conferred by federal statute and ultimately, by the Constitution. As such, federal law controls the interpretation of those agreements. *See United States v. Seckinger,* 397 U.S. 203, 209–210, 90 S.Ct. 880,

884, 25 L.Ed.2d 224 (1970). *See also United States v. County of Allegheny,* 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed.2d 1209 (1944). Since federal common law determines the rights of the parties to the agreements, it should be equally determinative of the rights of alleged third-party beneficiaries of those agreements. *See Pennsylvania v. National Ass'n of Flood Insurers,* 378 F.Supp. 1339, 1345 n. 15 (M.D.Pa.1974), *modified on other grounds,* 520 F.2d 11 (3d Cir. 1975). Since federal common law is the applicable decisional body of law, Plaintiffs' claim based upon the grant agreements can be said to arise under federal law for purposes of subject matter jurisdiction. *Id.*

Plaintiffs in the instant case have offered no contractual provision which evinces an intent that the Catholic Conference will be liable to individual refugees in the event it fails to perform its contractual duties. The record is devoid of evidence showing that the agreements were to vest direct rights in individual refugees as third-party beneficiaries. Therefore, the refugees can only be considered incidental beneficiaries of the grant agreements.

The language of the agreements not only fails to support the alleged liability to third parties but it also fails to establish a duty on the part of the Catholic Conference to pay individual refugees "unused" portions of grant money. Thus, even if Plaintiffs were able to show that they are "intended" rather than "incidental" beneficiaries of the grant agreements, they cannot establish that the Conference breached any contractual duty by failing or refusing to award them "unused" portions of the per capita grants.

Accordingly, Plaintiffs cannot maintain their claim under the grant agreements.

\*    \*    \*    \*    \*    \*

This Court has carefully considered all claims and arguments proffered by Plaintiffs and has done so with great latitude to them in light of the nature of the case and the plight of the Plaintiffs as new residents of this country. However, because it is the opinion of this Court that Plaintiffs are unable to sustain their action on the basis of the facts alleged and the applicable law, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is granted.