588 A.2d 1327

**DEPARTMENT OF TRANSPORTATION, Petitioner,**

**v.**

**IA CONSTRUCTION CORPORATION a Corporation in Its Own Right and for the Use and Benefit of Cleveland Wrecking Co., a Corporation, and Cleveland Wrecking Co., in Its Own Right, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Dec. 3, 1990.

Decided March 28, 1991.

James W. Kutz, Asst. Counsel, with him, John L. Heaton, Chief Counsel, Harrisburg, for petitioner.

Noah Gorson, Gorson & Gorson, P.C., Philadelphia, with him, Scott Staruch, Laws & Staruch, Harrisburg, for respondents.

Before DOYLE and McGINLEY, JJ., and BARRY, Senior Judge.

McGINLEY, Judge.

The Department of Transportation (DOT) petitions for review of an order of the Board of Claims (Board) awarding IA Construction Corporation (IA) $19,683.90 and Cleveland Wrecking Co. (Cleveland) $70,000.00 in a contract dispute. The issues presented for our review are whether the Board erred in ruling that a bridge reconstruction contract between DOT and IA was ambiguous with regard to the type of protection required to shield an underlying refinery owned by Gulf Oil Company (Gulf Oil) from falling debris and whether the Board erred, by ignoring substantial evidence, in ruling that DOT ratified Cleveland's interpretation of the term "positive shielding" at a November 30, 1982 meeting between the parties. We affirm.

On September 8, 1982, IA entered into a contract with DOT for highway improvements in the City of Philadelphia which encompassed the reconstruction of the George M. Platt Bridge (Bridge) and its approaches carrying Penrose Avenue across the Schuylkill River. IA, the general contractor, subsequently negotiated with Cleveland, a subcontractor, for certain demolition, removal, and disposal work on the project.

On November 30, 1982, a meeting was held between IA, DOT, Cleveland, and Gulf Oil to discuss demolition of a

portion of the Bridge's old superstructure. The general contract required that "the contractor shall provide *positive shielding* to protect Gulf Oil's property from any falling concrete, steel, sparks or any other equipment, or material during any of the contractors' or subcontractors' operations." (Emphasis added.) Reproduced Record (R.R.) at 31a–32a. This provision of the contract, entitled "Protection of Gulf Oil Company Facilities," also required that protection and shielding schemes be submitted for approval by DOT and Gulf Oil. R.R. at 32a. At the meeting, Cleveland described its plan of demolition and shielding. Cleveland's plans were accepted by DOT and Gulf Oil. As a result, Cleveland formally entered into the subcontract. Cleveland's plan for shielding included vertical metal shields to prevent falling debris from bouncing into areas of Gulf Oil's refinery as well as on-ground measures including snow fences erected to keep pedestrians from walking underneath the Bridge.

Following the November 30, 1982 meeting, Cleveland commenced its demolition operations in accordance with its plans. In January of 1983, during the course of Cleveland's demolition work, several small concrete pieces fell to the ground on Gulf Oil's property. On January 25, 1983, Gulf Oil requested that DOT require IA to place continuous solid shielding underneath the Bridge from Second Street to the river. On February 1, 1983, DOT issued a written directive ordering IA to install the continuous solid shielding as requested by Gulf Oil. Cleveland objected to DOT's directive and a meeting was subsequently held between the parties. Nonetheless, DOT refused to consider any alternative to the installation of continuous solid sheeting under the deck of the Bridge from Second Street to the river. IA employees then installed the wood sheeting under the Bridge and charged the work to Cleveland's account.

IA and Cleveland presented claims to DOT for additional compensation as a result of the directive to install the continuous solid shielding. DOT denied the claims. IA and Cleveland subsequently filed a claim before the Board for

the additional compensation. Hearings were held at which IA, Cleveland, and DOT presented evidence. On June 4, 1990, the Board issued its decision awarding IA $89,683.90 for the installation of the shielding with the direction that $70,000.00 of the award was for the use and benefit of Cleveland. DOT appeals.

On appeal from a Board decision, our scope of review is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. 2 Pa.C.S. § 704; *Department of Transportation v. Burrell Construction and Supply Co.*, 111 Pa.Commonwealth Ct. 590, 534 A.2d 585 (1987).

DOT first contention is that the Board committed an error of law in ruling that the contract between IA and DOT was ambiguous. Specifically, DOT alleges that the method requested by DOT (continuous solid shielding) was within the scope of the contract; that the schemes initially utilized by IA were ineffective and thus DOT had a contractual right to require an effective method; and that the Board erred in ruling that DOT could have made the contract clearer.

In its decision, the Board noted that although under the terms of the contract, IA was to provide "positive shielding" to protect Gulf Oil's property, the term "positive shielding" was not defined and was subject to different interpretations. Board's Decision, June 4, 1990 at 8. Thus, the Board concluded that the term "positive shielding" was ambiguous and that an examination of the contract documents did not provide a definition of "positive shielding." Board's Decision at 8–9. The Board further noted that "positive shielding" could easily have been more precisely defined by DOT as "continuous solid shielding."

To begin, we note that the function of contract interpretation and construction is a question of law peculiarly within the province of this Court's review. *Department of Transportation v. Mosites Construction Co.*, 90

Pa.Commonwealth Ct. 33, 36, 494 A.2d 41, 43 (1985). If a contract is reasonably susceptible of different constructions, is obscure in meaning through indefiniteness of expression or has a double meaning, then it is ambiguous. *Id.* If the intention of the parties is unclear from the words of the contract, we may examine extrinsic evidence including consideration of the subject matter of the contract, the circumstances surrounding its execution, and the subsequent acts of the parties. *Id.*, 90 Pa.Commonwealth Ct. at 37, 494 A.2d at 43. Furthermore, although the general rule is to resolve ambiguities against the drafter of the contract, decisional law has created an exception for government construction contracts which contain an obvious or glaring ambiguity. In such cases, the contractor is obliged to inquire and attempt to resolve the problem before entering into the contract. *Id.*, 90 Pa.Commonwealth Ct. at 38, 494 A.2d at 44.

In the present case, the Board made the finding that the term "positive shielding" was interpreted differently by DOT, IA, Cleveland and Gulf Oil. Finding of Fact No. 27. The Board also made the finding that the vertical metal shields erected by Cleveland constituted a form of positive shielding. Finding of Fact No. 28. The Board also noted that "positive shielding" was not defined in the general contract and that various forms of positive shielding exist for bridge demolition. Finding of Fact No. 21. The Board further noted that the "continuous solid shielding," as required by DOT, did not prevent concrete from falling to the ground. Finding of Fact No. 33. These findings are supported by substantial evidence. H. William Merz, Jr. (Merz), IA's Vice President, testified before the Board that positive shielding can be erected either over an area to be protected or alongside an area. Notes of Testimony, June 20, 1989 (N.T. at 153. Joseph Francis Meehan (Meehan), DOT's Assistant Construction Engineer, testified that no particular method of shielding was specified in the contract. N.T. at 476. Meehan also testified that small pieces of concrete and wood fell through the solid wood sheeting. N.T. at 468, 667–668. As a result, we conclude that the

Board did not err in holding the term "positive shielding" to be ambiguous. However, we also conclude that the ambiguity in the term "positive shielding" was not so "obvious" or "glaring" as to require IA to resolve the ambiguity before entering the contract. Accordingly, since the intent of the parties, as to the method of "positive shielding" to be used, was not set forth in the contract, the Board acted properly in examining extrinsic evidence.

At the November 30, 1982 meeting, Cleveland informed DOT and Gulf Oil of its proposed methods of shielding. Cleveland's proposal did not include continuous solid shielding. However, Cleveland's plan was accepted by Gulf Oil and DOT. Findings of Fact No. 23 and No. 24. These findings are also supported by substantial evidence. Michael D. McHugh (McHugh), a Cleveland employee for sixteen years, testified that Meehan and several representatives from Gulf Oil were present at the November 30, 1982 meeting and agreed with Cleveland's plan for positive shielding. N.T. at 291–295. McHugh also testified that although he received IA's contract on November 17, 1982, he would not sign it until Gulf Oil and DOT accepted Cleveland's methods at the November 30, 1982 meeting. Finding of Fact No. 23. N.T. at 292. As a result, in December of 1982, Cleveland began its demolition operations on the Bridge.

As noted by the Board, DOT had allowed Cleveland to begin demolition operations *without* continuous solid shielding. Furthermore, we note that Cleveland sought approval for its method of shielding before signing the subcontract with IA. Accordingly, we must conclude that the Board did not err in determining that the contract did not require that continuous solid shielding be installed over Gulf Oil's property. Furthermore, as the Board noted, DOT could have easily provided in the general contract, as it did in its February 1, 1983 directive, that continuous solid shielding be utilized over Gulf Oil's property.

DOT's second contention is that the Board committed an error of law and ignored substantial evidence in ruling that

DOT ratified the meaning of positive shielding at the November 30, 1982 meeting. Specifically, DOT argues that the Board ignored the testimony of Meehan, the only DOT representative at the meeting. DOT alleges that Meehan testified that no agreement was reached as to the method of protecting Gulf Oil's property. *See* N.T. at 481. R.R. at 179a.

*In Consolidated Rail Corporation v. Pennsylvania Liquor Control Board*, 90 Pa.Commonwealth Ct. 595, 496 A.2d 422 (1985), we noted that resolution of conflicting evidence, as well as the credibility of the witnesses, is for the Board to determine. *Id.*, 90 Pa.Commonwealth Ct. at 596, n. 1, 496 A.2d at 423, n. 1. Thus, the Board was not bound by Meehan's testimony and could chose to accept McHugh's testimony that there was an agreement as to the method of shielding to be used.

■ DOT also contends that the Board erred as a matter of law in ruling that DOT "ratified" Cleveland's interpretation of positive shielding. DOT alleges that the term "ratification," as it is used in contract law, applies to a subsequent approval of a voidable act and even if the Board had construed "ratification" to mean "subsequent acts of the parties" the alleged ratification by DOT is only one limited act among many factors which must be considered.

DOT's position is untenable. The Board noted, that at the November 30, 1982 meeting, DOT accepted Cleveland's method of shielding without question and allowed the demolition operations to begin. Thus, the Board concluded that DOT's initial acceptance of Cleveland's proposed plan amounted to a ratification of Cleveland's definition of positive shielding. Board's Decision at 13. Under the "subsequent acts of the parties" doctrine, the Board could look to the parties conduct at the November 30, 1982 meeting to determine the definition of positive shielding. Since neither DOT nor Gulf Oil objected to Cleveland's methods of shielding and allowed operations to begin, we must conclude that the Board did not err in holding that DOT and Gulf Oil ratified Cleveland's methods of shielding as being the "positive shielding" required by the contract.

■ DOT's final contention is that the Board erred in considering the parties' conduct at the November 30, 1982 meeting as relevant to the interpretation of the contract in that neither IA nor Cleveland could prove reliance on their own interpretation of the ambiguity. This argument is completely without merit. Merz, IA's Vice President, testified that IA prepared its bid based upon the type of shielding required. N.T. at 40. More importantly, as previously noted herein, Cleveland would not sign the contract until its proposed methods of shielding were approved at the November 30, 1982 meeting. N.T. at 291–293. Clearly, both IA and Cleveland relied upon their own interpretation of "positive shielding."

The order of the Board of Claims is affirmed.

## ORDER

AND NOW, this 28th day of March, 1991, the order of the Board of Claims in the above-captioned case is affirmed.