Erika M. DRUMMOND; Irvin Dinkins; Azeb Kinder et al.

v.

UNIVERSITY OF PENNSYLVANIA; Trustees of University of Pennsylvania et al. (Three Cases).

Appeal of Erika M. DRUMMOND; Irvin Dinkins; Azeb Kinder et al., Appellants.

Appeal of The TRUSTEES OF the UNIVERSITY OF PENNSYL-VANIA, Appellants.

Appeal of CITY OF PHILADELPHIA, Edward G. Rendell et al., Appellants.

Commonwealth Court of Pennsylvania.

Argued Oct. 5, 1994.
Decided Dec. 5, 1994.

Thomas K. Gilhool and Michael Churchill, for appellants/appellees Erika M. Drummond, Irvin Dinkins and Azeb Kinder et al.

Michael F. Eichert, for appellants City of Philadelphia and Edward G. Rendell et al.

Arthur Makadon, for appellees/appellants Univ. of Pennsylvania and Trustees of Univ. of Pennsylvania et al.

Before COLINS, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and NEWMAN, JJ.

PELLEGRINI, Judge.

Erika Drummond and numerous other Philadelphia school students, through their parents, various labor unions, civic groups and others (collectively, Objectors) appeal the order of the Court of Common Pleas of Philadelphia County (trial court) denying their petition for injunction and specific performance of ordinances and of agreements between the City of Philadelphia [1] and the trustees of the University of Pennsylvania (University) which they alleged required the University to each and every year provide 125 full-tuition scholarships. The trial court denied the requested injunction because none of the plaintiffs had standing and because it disagreed with the Objector's proposed interpretation of the agreements.

The general question in this appeal is the number of scholarships to be provided by the University to students of Philadelphia schools under agreements entered into by the City and the University in 1977. Those agreements were the result of a series of agreements and ordinances between the parties beginning in the last century. The agreements had their origin when city council, on January 24, 1882, authorized the City, by ordinance, to convey land to the University subject to various conditions, including that:

Trustees of the said University of Pennsylvania shall establish and forever maintain

at least fifty (50) free scholarships, of an annual value of not less than seven thousand five hundred (7,500) dollars per annum, to be awarded under such conditions as may from time to time be deemed suitable to worthy and deserving students of the Public Schools of Philadelphia....

The ordinance also contained a condition that the University could not alienate the tracts without the consent of the City.

In a June 15, 1910 ordinance, city council approved the conveyance of additional tracts of land to the University, required an additional 75 free scholarships and made the scholarships available to all students in the City, not just to those in the public schools. In relevant part, it provided:

Trustees of the University of Pennsylvania shall establish and forever maintain seventy-five (75) free scholarships in any of the Departments of the University, to be awarded by the Mayor of the City to deserving students of all the schools of Philadelphia....

The 1910 ordinance similarly provided that the University could not alienate the tracts without the consent of the City.

This was the status of the agreements until 1977 when the University sought to mortgage the property conveyed to it by the City under the previous agreements. Because the bar to alienation made it impossible to mortgage the property, the University needed a change in the agreements. In response, on August 1, 1977, city council enacted Bill No. 832 (Ordinance) authorizing agreements to be entered into with the University to allow the University to mortgage the property. The Ordinance recited provisions contained in the 1882 and 1910 ordinances and stated in the preamble, in pertinent part, that:

WHEREAS, in consideration of the consent by the City of Philadelphia to the execution and delivery by the University of the aforesaid mortgage ... the University has agreed to increase the annual value of

---

1. The additional defendants in this action are Edward M. Rendell in his capacity as the Mayor of the City, Andrez Perez in his capacity as the Commissioner of Public Property, the mayor's scholarship committee, and David L. Cohen, Herbert DeBeary Sr., Chaka Fattah, Thomas Forkin and Amy Podolski in their capacities as the members of the mayor's scholarship committee (collectively, City).

the scholarships awarded pursuant to the ordinances approved January 24, 1882 and June 15, 1910 by providing that a total of one hundred twenty-five (125) full tuition scholarships will be awarded by the Mayor of the City of Philadelphia to deserving students from all of the schools of Philadelphia.

More specifically, Section 2 of the Ordinance states as follows:

[The City's] consent is contingent upon the said Trustees' entering into an agreement with the City (i) to establish and forever maintain *at least one hundred twenty-five, four-year, full tuition scholarships,* or their equivalent, in any of the Departments of the University, *to be awarded annually* by the Mayor of the City of Philadelphia to deserving students from all of the schools of the City, which obligation shall be assumed by the Trustees in lieu of the obligation to establish and maintain at least fifty free scholarships ... imposed by Ordinance approved January 24, 1882, and in lieu of the obligation to establish and maintain seventy-five free scholarships ... imposed by an Ordinance approved June 15, 1910.... (Emphasis added.)

Section 5 authorizes the commissioner of public property to enter into an agreement with the University whereby the University shall "establish and forever maintain *at least one hundred twenty-five, four-year, full tuition scholarships,* or their equivalent, in any of the Departments of the University, *to be awarded annually* by the Mayor of the City of Philadelphia to deserving students from all of the schools of the City...." (Emphasis added.)

On the same day, city council enacted another ordinance, Bill No. 834 (collectively, the 1977 ordinances) authorizing the commissioner to execute and deliver a deed of release to certain premises in West Philadelphia bound by Spruce Street, Woodland Avenue, Pine and Thirty-sixth Streets, provided that the University shall have entered into the agreement authorized by the Ordinance and which set forth the University's obligation exactly as stated in the Ordinance.

With that authorization, on August 11, 1977, the City, through the commissioner and the University, entered into an agreement referencing the Ordinance and embodying the University's commitment. The agreement states that to fulfill its part of the contract, the University will:

establish and forever maintain at least one hundred twenty-five, four-year, full tuition scholarships, or their equivalent, in any of the Departments of the University, to be awarded annually by the Mayor of the City of Philadelphia to deserving students from all of the schools of the City.

On January 26, 1978, the City and the University entered into another agreement referencing the 1977 ordinances and restating the same language quoted above. It is the interpretation of those agreements that is the subject of this litigation.

After the 1977 agreement, the University calculated its annual commitment by multiplying current tuition by the number of scholarships required. Then scholarships were awarded in varying amounts to students depending on their need. Some students received less than the tuition amount in the form of a scholarship but were awarded financial aid in the form of loans and work study. Other students received more than the tuition amount in order to cover additional costs such as books, room and board. The University at times underfunded its obligation to provide full-time scholarships.

Objectors sued as representatives of a class of Philadelphia school children from poor and working families seeking a declaration that the actions of the University and the City violated the 1977 ordinances and requesting the court to permanently enjoin the University and the City from violating the 1977 ordinances by annually awarding less than 125 four-year, full tuition scholarships and failing to award the scholarships to only deserving students. Objectors also requested that the University be ordered to recompense the school children of Philadelphia and members of the class for the University's failure to comply with the 1977 ordinances and the agreements.

At trial, Objectors presented the testimony of parents of students of the City's public schools and/or the organization leaders.

They testified that if the required number of scholarships had been awarded, their students may have been recipients. They also testified that those students who did receive Mayor scholarships were not receiving full tuition. Also for Objectors, Sheldon L. Albert, the city solicitor in 1977, testified that his office drafted the language at issue and inserted the word "annually" and, he believed, the Ordinance and agreements provided that 125 scholarships were to be awarded annually. Harry B. Jannotti, the finance chair and vice-chair of the rules committee of city council in 1977, agreed with Albert's interpretation.

Objectors also presented minutes of the city council rules committee hearing on July 29, 1977, where discussion occurred regarding the City's gain by virtue of the increase in scholarships, and that the 125 scholarships for the following year would be slightly in excess of $500,000.

The University presented, among other things, a letter dated February 5, 1992, from Judith E. Harris, city solicitor, to John F. Street, city council president. Harris reasoned that because the 1882 ordinance limited the value of the 50 scholarships to $7,500 and the value of those scholarships could be increased significantly by eliminating the cap and making each a "full tuition" scholarship, and because the Ordinance and agreements substitute the term "free scholarships" with the term "full tuition," the current language "when properly interpreted to give effect to the intent of the parties" supports the University's position that it is only obligated to provide 125 scholarships or their equivalent at any time.

Although the trial court determined that Objectors did not have standing to bring this action either as taxpayers or third party beneficiaries, it relied upon the interpretation of the provisions provided by Harris and determined that because the University and the City never intended the University's obligation to be greater than that stated by Harris, the Ordinance and agreements require 125, four-year, full tuition scholarships or their equivalent so that at any given point in time there would be 125 mayor's scholarships or their equivalent.[2] Nonetheless, the trial court concluded that the University has underfunded its obligations under the Ordinance by failing to give full-tuition scholarships to all of the mayor's scholars instead of providing $500 scholarships and financial aid packages based on need which contained loans and work-study, and awarding scholarships to students who graduated from schools not located in Philadelphia. The parties then filed their appeals.[3]

On appeal to this court, Objectors argue that the trial court erred when it determined that they did not have standing; did not properly construe the Ordinance in terms of the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991, and ignored the clear language of the Ordinance; and erred by not granting class certification to Objectors. The University maintains that Objectors do not have standing and that the court applied the correct principles of statutory construction and properly interpreted the substantive provisions of the Ordinance, but argues that the court overlooked the language "or their equivalent" when it stated that there has been an underfunding of scholarships. The City joins in the brief of the University.

The issues presented in these consolidated appeals are whether the trial court erred in

---

**2.** On October 27, 1992, the City and the University entered into an agreement referencing a proposed bill before city council that would "clarify" the language of the agreements and reaffirmed their mutual understanding with respect to the University's legal obligation as to the number of scholarships to be provided pursuant to the 1977 ordinances; set forth new procedures regarding implementation of the mayor's scholarship program; and provided that no party other than the City and the University have standing to enforce the agreement. The trial court found that this agreement was not valid, and neither the University nor the City has challenged this finding in their appeals.

**3.** This court's scope of review of a final decree in equity is limited to a determination of whether the trial court committed an error of law or abuse of discretion. *Moser v. DeSetta*, 527 Pa. 157, 589 A.2d 679 (1991). A decree will not be disturbed unless it is not supported by the evidence or demonstrably capricious. *Tredyffrin–Easttown School District v. Valley Forge Music Fair, Inc.*, 156 Pa.Commonwealth Ct. 178, 186 n. 4, 627 A.2d 814, 818 n. 4 (1993).

determining that Objectors do not have standing to bring their action and in interpreting the ordinances.

## I.

■ Standing is the requirement that the person bringing an action be adversely affected by the matter they seek to challenge to assure that they are an appropriate party to bring the matter to a judicial resolution. *Pennsylvania Game Commission v. Department of Environmental Resources*, 521 Pa. 121, 555 A.2d 812 (1989). Initially, Objectors contended that the matter sought to be challenged were the 1977 ordinances and the number of scholarships to be awarded under those provisions. As such, they contended that they have standing to challenge actions under the ordinance because they have a distinct interest in schooling at the University because, as students in Philadelphia schools, they fit within the group to which the scholarships should be given. Because they believe they have rights under the Ordinance, they rely on *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975), and its progeny, specifically, *Application of Biester*, 487 Pa. 438, 409 A.2d 848 (1979), to bring this challenge.[4]

■ The *Biester* exception recognizes that the prevention of waste of tax revenue is insufficient to allow standing but then allows "taxpayer standing" where otherwise the action would go unchallenged.[5] The elements for this taxpayer standing are also that those directly affected are beneficially affected, ju-

dicial relief is appropriate, redress through other channels is unavailable, and no other person is better situated to assert the claim. *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986). We restated the basis of this standing in *Rizzo v. City of Philadelphia*, 136 Pa.Commonwealth Ct. 13, 17–18, 582 A.2d 1128, 1130 (1990), *petitions for allowance of appeal denied*, 527 Pa. 653, 658, 593 A.2d 424, 428, 429 (1991):

> [S]pecial cases will grant a taxpayer standing even when his or her interest may not be substantial, direct, and immediate. Such cases arise when governmental action will go unchallenged unless the taxpayer has the ability to intervene by judicial process. In particular, these cases will most often occur where 'those directly and immediately affected by the complained of conduct were beneficially affected as opposed to adversely affected,' thus making it improbable that a party will challenge the governmental action before the agency or on appeal. A taxpayer may in the appropriate case therefore have standing to challenge the action pursuant to his or her common interest as a citizen to ensure the legality or propriety of the acts of government. (Citations omitted).

■ The taxpayer standing analysis in *William Penn* and *Biester* is inapplicable. That type of standing may exist only when a taxpayer is challenging obligations placed on the general public or emoluments given through the exercise of governmental power

---

4. One who seeks to challenge governmental action such as the validity of a statute or ordinance must show a direct and substantial interest and must show a sufficiently close causal connection between the challenged action and the injury. *William Penn.* Just paying a tax is insufficient unless the plaintiffs establish an individual interest beyond the interest of all citizens. *William Penn.*

5. Standing under the exception in *Biester* has been denied in several cases, for example, in *Biester.* In that case, the Supreme Court denied taxpayer standing for a challenge to the summoning of a grand jury because those subject to the grand jury could be expected to challenge the action and would be expected to raise precisely the same constitutional challenge as brought by the plaintiff. In *Upper Bucks County Vocational–*

*Technical School Education Association v. Upper Bucks County Vocational–Technical School Joint Committee*, 504 Pa. 418, 474 A.2d 1120, 1122 (1984), the Supreme Court denied taxpayer standing under *Biester* because the teachers lacked a direct interest, that is, a causal connection between the action and the harm to their interests. The teachers brought the action against the school for failure to schedule at least 180 school days which would result in a *pro rata* loss in state subsidy, but the Supreme Court held that there was no allegation of a harm to their individual taxpayer interest caused by the school's action and some degree of causal connection must be present to meet the requirements for taxpayer standing exception under *Biester.*

imposed or given by general ordinances or statutes.[6]

What is at issue here is not a challenge to the general governmental power but a challenge to an interpretation of agreements entered into by the City and the University. Only the language in the August 11, 1977 agreement for a mortgage and the January 26, 1978 Deed of Release, which were signed by both parties, bind those parties. (Plaintiffs' Exhibits 3 and 4 in the Original Record). At oral argument, Objectors conceded that their standing now rests on their position that they are third-party beneficiaries to the agreements.

■ The general principle for when a party is a third-party beneficiary of a contract was set forth in the seminal case *Spires v. Hanover Fire Insurance Company*, 364 Pa. 52, 56–57, 70 A.2d 828, 830–31 (1950) (plurality opinion):

> To be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by one of the parties to the contract and the third person that the latter should be a beneficiary, but both parties to the contract must so intend and must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract unless the latter was within his contemplation at the time the contract was entered into and such liability was intentionally assumed by him in his undertaking.... (Emphasis and footnote omitted).

But in *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983), the Supreme Court carved out an exception to the *Spires* rule by adopting Section 302 of the Restatement (Second) of Contracts:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the

beneficiary is appropriate to effectuate the intentions of the parties and either

> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*See Guy*, 501 Pa. at 60, 459 A.2d at 751. Whether third-party beneficiaries status is appropriate to carry out the intention of the parties is left to the trial court's discretion. *Scarpitti v. Weborg*, 530 Pa. 366, 609 A.2d 147 (1992). In *Scarpitti*, the Supreme Court made clear that a party is a third-party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself unless the exception in Section 302 of the Restatement (Second) of Contracts applies. *Id.* at 372–73, 609 A.2d at 150.[7]

■ However, the exception to the general principle does not apply where, as here, the contract at issue is one with a governmental body. When a governmental contract is at issue, the test for whether a member of the public is a third-party beneficiary must be strictly applied. *See Clifton v. Suburban Cable TV Company, Inc.*, 434 Pa.Superior Ct. 139, 642 A.2d 512 (1994). *See also* Section 313 of the Restatement (Second) of Contracts. Generally, a promisor who contracts with a government is not subject to contractual liability to a member of the public because individual members of the public are merely incidental beneficiaries unless a different intention is manifested within the contract. *Nguyen v. United States Catholic Conference*, 548 F.Supp. 1333 (W.D.Pa.1982), *affirmed*, 719 F.2d 52 (3d Cir.1983); *Townsend v. City of Pittsburgh*, 383 Pa. 453, 119 A.2d 227 (1956).

> Something more than mere intent to benefit some third party must be shown for the third party to have actionable rights under the contract. *Pennsylvania v. National*

---

6. Even if the taxpayer standing analysis in *William Penn* and *Biester* applied, the exception under *Biester* would not allow standing in this case because the City is better situated to assert any claim.

7. Before it was settled in *Scarpitti*, there was considerable disagreement in the lower courts as to the application of *Guy*. *See Linde Enterprises, Inc. v. Hazelton City Authority*, 412 Pa.Superior Ct. 67, 602 A.2d 897 (1992), *petition for allowance of appeal denied*, 533 Pa. 601, 617 A.2d 1275 (1992).

*Ass'n of Flood Insurers,* 378 F.Supp. [1339] at 1347–1348 [M.D.Pa.1974]. *There must be language evincing an intent that the party contracting with the government will be held liable to third parties in the event of nonperformance.* Id. See also *Schell v. National Flood Insurers Ass'n,* 520 F.Supp. 150, 157 (D.Colo.1981). Otherwise, the third parties are merely incidental beneficiaries having no actionable rights under the contract. The fact that third parties will benefit more directly from performance of the contract than members of the public at large does not alter their status as incidental beneficiaries. Id.

*Nguyen* at 1348. (Emphasis added.)

Likewise, under Section 313 of the Restatement (Second) of Contracts dealing with governmental contracts, adopts a similar requirement that there be express language that a party is intended to be a third-party beneficiary:

> In particular, a promisor who contracts with a government or governmental agency to do an act for or render service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless
>
> (a) the terms of the promise provide for such liability; [8]

■ In this case, there is nothing within the contract to reveal an intention by both the City and the University at the time the agreements were signed that the University would be liable to members of the public for nonperformance or if they disagree with the interpretation of the agreements. In fact, the August 11, 1977 agreement specifically states that "in the event of a default by The Trustees of the University of Pennsylvania hereunder, the City of Philadelphia's sole remedy and recourse shall be an action against The Trustees of the University of Pennsylvania for violation of the terms of this Agreement"; the agreement establishes that if the University defaults, it can only be liable to the City in an action based on the contract. (Plaintiff's Exhibit 3, Original Record). Just because certain students, assuming they were found in the mayor's discretion to be "deserving" students, may receive or have received mayor scholarships if the agreements were interpreted to require the award of 125 each year, does not alter their status as incidental beneficiaries. *Nguyen.* See also *Sims v. Silver Springs–Martin Luther School,* 155 Pa.Commonwealth Ct. 619, 629–30, 625 A.2d 1297, 1303 (1993).

Even if the exception in Restatement Section 302 applies, a recognition of a right to performance in Objectors under the exception in Section 302 of the Restatement is not appropriate to effectuate the intention of the parties. As stated in *Clifton,* government contracts are for the benefit of every member of the public but it is not necessary for each person, or even those who are directly benefited, to have an independent right to enforce a contract which the governmental body is able to enforce. The trial court found that standing was inappropriate because, among other things, the mayor was elected by all citizens and has the authority to enforce contracts and ordinances under the Philadelphia Home Rule Charter. Elected officials are charged with interpreting governmental contracts, not incidental third-parties.[9]

Accordingly, we affirm the decision of the trial court that Objectors do not have standing to bring this challenge to the interpretation of agreements between the City and the University. However, even if Objectors did have standing, we believe the language of the contract is ambiguous on this issue.

---

8. There is no allegation that subsection (2)(b) of Section 313 of the Restatement of Contracts (Second) applies. That provision would impose liability against the promisor only if the government party is subject to liability to a member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract prescribing remedies for its breach.

9. Additionally, allowing the Objectors standing would give them the ability to impose a different contractual liability on the University than that asserted by the parties to the contract. This runs counter to the rule that when the parties have attached the same meaning to an agreement, it should be interpreted in accordance with that meaning. Section 201 of the Restatement (Second) of Contracts.

## II.

■ Assuming Objectors did have standing as to the interpretation of the agreement language, the initial question is a legal one—whether the language is ambiguous. If it is clear, it is a question of law. If it is ambiguous, however, what the agreement means is determined by the surrounding facts and circumstances and that is a decision for the trier of fact. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385 (1986).

■ An ambiguity exists if the language is subject to two or more reasonable interpretations. *New Castle County v. Hartford Accident & Indemnity Co.*, 970 F.2d 1267 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993). If the court determines that the language is ambiguous, then it is for the trier of fact to determine what the parties intended by resolving conflicts in the relevant parol evidence. *Hutchison.* Initially, the court must ascertain whether the intent of the parties only as manifested by the language of the contract is clear. *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563 (1983).

■ Recognizing that if found to be ambiguous, the trial court's interpretation is controlling if supported by the evidence, Objectors contend that the pertinent language in the agreements is free from ambiguity, and that it is clear that the University and the City intended to award 125 scholarships each and every year. The University and City contend that while the language is ambiguous, the intention of the parties was that there be 125 scholarships, or the equivalent, maintained at any one time. Again, the words in the agreements between the City and the University state that the University will "establish and forever *maintain at least one hundred twenty-five, four-year, full tuition scholarships, or their equivalent,* in any of the Departments of the University, *to be awarded annually by the Mayor* of the City of Philadelphia to deserving students from all of the schools of the City."

The language of the agreements is ambiguous because the phrase "to be awarded annu-ally by the Mayor ..." refers back to the scholarships established by the University. The entire phrase is "at least one hundred twenty-five, four-year, full tuition scholarships" and the word "annually" could mean that annually, 125 scholarships must be awarded or that the mayor will annually award some scholarships. The latter interpretation combined with the phrase requiring the University to "establish and maintain" the scholarships could be interpreted to mean each year some scholarships will be awarded in whatever number is required to maintain 125 total.

The ambiguity here is much more apparent than in other cases where the court has found an ambiguity to exist. For example, in *Hutchison,* a mine lease agreement stated "[T]his lease shall continue for a period of 3 years from the effective date hereof or until all the coal which the Coal Operator determines can be mined, removed and sold with economy and profit has been removed or so long as minimum advance royalties are being tendered by the Coal Operator." The Coal Operator argued that so long as he continued to pay royalties, even though no mining has occurred, the lease continues beyond the three year period. The Supreme Court held that the provision was ambiguous because it was reasonably susceptible to two interpretations concerning the duration of the lease.

Also, where the term "positive shielding" in a bridge reconstruction contract was not defined in the contract and various forms of positive shielding exist in bridge demolition, and several parties disagreed as to the correct definition, we held that the term was ambiguous. *Department of Transportation v. IA Construction Corporation,* 138 Pa.Commonwealth Ct. 587, 593–94, 588 A.2d 1327, 1330 (1991). We stated that a term is ambiguous if it is reasonably susceptible to different constructions, is obscure in meaning through indefiniteness of expression or has a double meaning. *Id.* at 593, 588 A.2d at 1330.

■ Where the language of an agreement is subject to at least two reasonable interpretations, the ambiguous language must be interpreted in light of the evidence of the parties' intentions. Because we agree

with the trial court that the language is ambiguous, as a matter of law, it was then up to the trial court as the fact finder to determine how to resolve the ambiguity. *Hutchison*. The evidence before the trial court included that:

- the parties' interpretation of the agreements;
- the main objective of the agreements was to allow the University to secure a loan because of its financial trouble;
- the parties' practice was to distribute the total number of scholarships to be awarded over the four classes at the University;
- there was no public statement of a large increase in the number of scholarships;
- the preamble of the ordinance stated that the purpose of the new agreement was to increase the annual *value* of the scholarships; and,
- the opinions of the city solicitors and the City's acceptance of the number of scholarships provided since 1977.

The trial court considered the evidence of the parties' intentions and resolved the conflicting evidence in favor of the interpretation that the intention of the parties was that some scholarships would be awarded annually in whatever number necessary for 125 total scholarships to be maintained at any given time.[10] Even if Objectors had standing, because we are not free to substitute our own judgment for that of the fact finder, we would affirm the trial court's interpretation that the University and City intended to maintain 125 full-tuition scholarships at any given time.

## ORDER

AND NOW, this 5th day of December, 1994, the orders of the Court of Common Pleas of Philadelphia County entered February 23, 1993, April 21, 1993, and May 26, 1993, No. 3785 October Term 1991, are affirmed.

McGINLEY, Judge, concurring.

I agree with the result reached by the majority. Further, I agree with the majority's analysis of the standing issue. I write separately, however, because I interpret the language of the ordinance as being clear and free from ambiguity. The preamble of the 1977 Ordinance provides, in pertinent part:

Whereas, in consideration of the consent by the City of Philadelphia to the execution and delivery by the University of the aforesaid mortgage and the agreement by the City of Philadelphia to join in such mortgage for the purpose of indicating its consent to such mortgage, *the University has agreed to increase the annual value of the scholarships awarded pursuant to the ordinances approved January 24, 1882, and June 15, 1910 by providing that a total of one hundred twenty-five (125) full tuition scholarships will be awarded by the Mayor of the City of Philadelphia to* deserving students from all of the schools of Philadelphia.... (Emphasis added).

Section 2 of the Ordinance provides in pertinent part:

That this consent is contingent upon the said Trustees' entering into an agreement with the City (i) *to establish and forever maintain at least one hundred twenty-five, four-year, full tuition scholarships, or their equivalent, in any of the Departments of the University, to be awarded annually by the Mayor of the City of Philadelphia to deserving students of all of the schools of the City,* which obligation shall be assumed by the Trustees in lieu of the obligation to establish and maintain at least fifty free scholarships of an annual value of not less than seven thousand five hundred (7,500) dollars per annum imposed by Ordinance approved January 24, 1882, and in lieu of the obligation to establish and maintain seventy-five free scholarships in any of the Departments of the

10. In regard to the University's and City's appeals of the trial court's conclusions that they underfunded their obligation, were required to give full-tuition to each scholarship student rather than awarding the equivalent of 125 full-tuition scholarships, and that prior students should be reimbursed, Objectors do not substantially address these issues, only arguing that loans and work study cannot be counted as part of the scholarship amount. Because of our decision that Objectors lack standing, these issues are not central to the case and the trial court's findings or statements on the matter are now dicta.

University to be awarded by the Mayor of Philadelphia to deserving students of all the schools of the City imposed by an Ordinance approved June 15, 1910.... (Emphasis added).

The language of Section 5 mirrors that of Section 2.

The preamble specifically refers to a *total* of 125 scholarships [1], while Section 2 refers to forever maintaining 125 scholarships or their equivalent. The phrase "to be awarded annually" obviously concerns the timing of the award of the scholarships, not the number. In other words the Mayor is to award the available scholarships annually, not that he is to award 125 per year.

SMITH, Judge, dissenting.

I dissent from the majority's decision to affirm the February 23, 1993 order of the Court of Common Pleas of Philadelphia county which denies scholarships to deserving graduates of Philadelphia schools—public, private and parochial. The scholarships are intended by clear and unambiguous terms of the 1977 ordinances of city council and resulting agreements between the City of Philadelphia and University of Pennsylvania. Objectors have standing as third-party beneficiaries and as taxpayers to seek enforcement of the local ordinances which authorize the agreements between the City and trustees of the University requiring the University to provide scholarships to students from the City's schools in exchange for authorization to mortgage certain tracts of land the City previously conveyed to the University. A plain reading of the 1977 ordinances and agreements specifically require the University to provide *125 four-year, full-tuition scholarships to be awarded annually,* meaning each year, to deserving graduates from Philadelphia schools.

I.

The rule for determining whether a party has standing as a third-party beneficiary to seek enforcement of a contract was set forth in the seminal case of *Spires v. Hanover Fire*

*Ins. Co.,* 364 Pa. 52, 70 A.2d 828 (1950). The Pennsylvania Supreme Court held in *Spires* that a third party has standing to seek performance of obligations under a contract when the contracting parties "express an intention that the third party be a beneficiary to whom the promisor's obligation runs in the contract itself." *Guy v. Liederbach,* 501 Pa. 47, 58, 459 A.2d 744, 750 (1983). The *Spires* Court noted that the contract need not specifically or individually designate a party as a beneficiary so long as the third party was in contemplation when the contracting parties entered into their agreement. *Spires,* 364 Pa. at 57 n. *, 70 A.2d at 831 n. *. *See also Sullivan v. County of Bucks,* 92 Pa.Commonwealth Ct. 213, 499 A.2d 678 (1985), *appeal denied,* 516 Pa. 623, 532 A.2d 21 (1986).

The Supreme Court also adopted Restatement (Second) of Contracts § 302 (1979) in *Guy.* Section 302 provides, in pertinent part, that "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." The test for third-party beneficiary status set forth in *Guy* does not require the manifestation of a mutual intention in the contract but bestows discretion on the trial court to determine whether recognition of third-party beneficiary status would be appropriate. *See also Scarpitti v. Weborg,* 530 Pa. 366, 609 A.2d 147 (1992); *Sullivan.*

In *Scarpitti,* the Supreme Court determined that homeowners in a subdivision were the intended third-party beneficiaries to a contract between an architect and a developer regarding uniform enforcement of deed restrictions. The Court reasoned that because the purpose of the agreement was to make the subdivision's lots more attractive to prospective purchasers and the homeowners are the limited group who have the greatest interest in and benefit from enforcement of the restrictions, the homeowners are intended third-party beneficiaries of the contract. Thus third-party beneficiary status is proper-

---

**1.** Preambles to ordinances may be considered in the construction thereof. 1 Pa.C.S. § 1924;

*Bundy v. Belin,* 501 Pa. 255, 461 A.2d 197 (1983).

ly conferred in Pennsylvania when either the contracting parties express in the contract an intention that the promisor's obligation benefit the third party or compelling circumstances dictate recognition of third-party beneficiary status to effectuate the intention of contracting parties. *Scarpitti; Guy; Spires.*

This Court applied the above test in *Sullivan* to two contracts involving governmental bodies. The Court allowed two water authorities third-party beneficiary status to enforce an agreement between a third water authority and Bucks and Montgomery Counties, and an agreement between the authority and a public utility company. Specifically, the first agreement required the contracting authority to construct a transmission main and Bucks County to cause the authority to construct a pumping station. The second agreement required the contracting authority to construct and maintain the pumping station and transmission main and the public utility company to construct a reservoir and pump house for public use by the two counties.

The Court explained in *Sullivan* that the non-contracting parties had standing under the *Spires* test because the contracting parties mutually intended, as manifested in the agreement, that the non-contracting parties would benefit from the promisors' obligations under the agreements. The non-contracting parties also had standing under the *Guy* test because the trial court properly determined that the circumstances indicate that the promisees, Montgomery County in the first agreement and the public utility company in the second agreement, intended for the non-contracting parties to receive the benefits of promised performance.

Objectors have established sufficient facts to satisfy the *Spires* and *Guy* tests. At trial, Objectors presented the testimony of, among others, Betty Bunn who established that she is the mother of four school children in the City's public schools, two of whom are "A

students" and plan to attend college; Carol Laden who testified that she is a taxpayer in the City and that her son Keith was admitted to the University for the fall 1992 semester and was selected for a mayor's scholarship but attends Yale University because the University of Pennsylvania did not provide Keith full tuition; and Martin Dias who testified that he is a taxpayer and president of a University student league and that mayor's scholars in his organization are not receiving full-tuition scholarships. Other students testified they either did not know about the scholarships or that if the required number of scholarships had been awarded, they may have been recipients.

Analysis of the agreements demonstrate an express manifestation of the intention of the City, as promisee, and the University, as promisor, that "deserving students from all of the schools of the City" benefit from the University's obligations. *Spires.* The circumstances also disclose that Objectors have the greatest interest in the uniform enforcement of the agreements, and creation of the mayor's scholarship committee evidences the City's intention to enforce the University's obligation for the benefit of deserving students. The University's actions in providing scholarships, albeit less than that required, demonstrate the University's contemplation that deserving students from the City's schools would benefit from its obligation. *Guy.* Consequently, the trial court erred as a matter of law and abused its discretion by determining that Objectors do not possess third-party beneficiary status to challenge the interpretation and enforcement of the agreements.[1]

Without any legal authority whatsoever, the majority carves an exception to the tests for third-party beneficiary standing. Case law does not support the application of a different test if one of the parties is a governmental entity, and this Court has consistently applied the *Spires–Guy* test to cases

1. Cf. *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville,* —— U.S. ——, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (to establish standing to challenge the government's imposition of barriers making it more difficult for members of one group to obtain a benefit than members of another group, the challenging party need only establish that he or she is part of the group subject to unequal treatment and need not allege that, but for the barrier, they would have obtained the benefit).

involving governmental units. *Sims v. Silver Springs–Martin Luther Sch.,* 155 Pa.Commonwealth Ct. 619, 625 A.2d 1297 (1993) (minor did not establish right to third party beneficiary status to a contract between a township and school district under *Spire* or *Guy* tests, since neither he nor anyone similarly situated were intended beneficiaries); *Sullivan.*

The majority cites *Nguyen v. United States Catholic Conference,* 548 F.Supp. 1333 (W.D.Pa.1982), *aff'd,* 719 F.2d 52 (3d Cir. 1983), and *Townsend v. Pittsburgh,* 383 Pa. 453, 119 A.2d 227 (1956), to support the proposition that when a governmental entity is involved, the *Guy* test is inapplicable. *Nguyen* and *Townsend* address third-parties rights to seek compensatory damages due to alleged breaches of governmental contracts pursuant to the Restatement (Second) of Contracts § 313 (1981) and the Restatement of Contracts § 145 (1932).[2] Neither *Nguyen* or *Townsend* preclude parties from filing actions challenging a contract's interpretation or enforcement. *See Sullivan; compare Clifton v. Suburban Cable TV Co. Inc.,* 434 Pa. Superior Ct. 139, 642 A.2d 512 (1994) (the trial court did not abuse its discretion in refusing to grant third-party beneficiary status to an inmate, under the circumstances, because the contract between the cable company and the Commonwealth to provide cable to prison cells expressly excluded prisoners from enforcing the contract.)

Objectors have established that they are among the group contemplated by the City and the University to receive the benefit of the University's obligation under the agreements. Objectors therefore have standing to challenge the interpretation and enforcement of the agreements. It should be noted that

the majority's bald assertion that the University can be held liable only to the City, op. at 579, and University counsel's similar assertion that only city council has standing to enforce the agreements can neither be supported by the 1977 ordinances, the agreements, nor case law.

II.

The majority has improperly concluded that interpretation of the agreements was the sole subject of this litigation. The majority has inexplicably dismissed the role of Philadelphia's city council in managing the City's real estate portfolio and completely ignored pertinent provisions of the Philadelphia Home Rule Charter prohibiting the commissioner of public property from entering into agreements regarding the City's real estate *unless authorized by ordinance.* Specifically, Section 8.8–205 of the Philadelphia Home Rule Charter, 351 Pa.Code § 8.8–205, provides that:

> A department, board or commission shall not sell or exchange any real estate belonging to the City or grant any license, easement, right of way, or other interest over or in such real estate without specific authority from the Council so to do. In deeds of land made by the City, appropriate restrictions may be imposed, including a restriction requiring that the design and location of structures to be altered or erected thereon be first approved by the Art Commission.

Because the City was precluded by law from entering into the agreements without the prior authority of council through enactment of the 1977 ordinances, interpretation of the ordinances are essential to the disposition of this matter and, as will be discussed below,

---

**2.** Section 145 provides in pertinent part:
A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members *to give compensation* for the injurious consequences of performing or attempting to perform it, or of failing to do so.... (Emphasis added.)
Section 313 provides in part:
[A] promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject *to*

*contractual liability* to a member of the public *for consequential damages* resulting from performance or failure to perform unless
(a) the terms of the promise provide for such liability; or
(b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach. (Emphasis added.)

provide an independent basis for Objectors' standing.

In order to establish standing to challenge a governmental act, a party need only allege that he or she has an immediate, direct and substantial interest in the subject matter of the litigation. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975); *Farley v. Zoning Hearing Bd. of Lower Merion Twp.*, 161 Pa.Commonwealth Ct. 229, 636 A.2d 1232 (1994). Usually, the common interests shared by all citizens and taxpayers in the administration of justice and proper resolution of disputes will not suffice to confer standing in a controversy, *Wm. Penn Parking Garage;* the challengers must establish a causal connection between the complained of action and their interests as taxpayers. *Upper Bucks County Vocational–Technical Sch. Educ. Assoc. v. Upper Bucks County Vocational–Technical Sch. Joint Comm.*, 504 Pa. 418, 474 A.2d 1120 (1984). *See also Sierra Club v. Hartman*, 529 Pa. 454, 605 A.2d 309 (1992).

However, the Pennsylvania Supreme Court has determined that in special cases where the denial of standing to taxpayers will cause governmental action to go unchallenged, taxpayers will be granted standing. *Sprague v. Casey*, 520 Pa. 38, 550 A.2d 184 (1988); *Application of Biester*, 487 Pa. 438, 409 A.2d 848 (1979). In conferring standing in these cases, the Supreme Court relied upon its earlier pronouncements that the fundamental reason for granting standing, where the interests arguably do not fit within the general requirements, is that a large body of governmental activity would otherwise go unchallenged in the courts. This Court recognized that consideration must also be given to the "appropriateness of judicial relief, the availability of redress through other channels, or the existence of other persons better situated to assert the claim." *Rizzo v. City of Philadelphia*, 136 Pa.Commonwealth Ct. 13, 18, 582 A.2d 1128, 1130 (1990), *appeals denied,*

527 Pa. 653, 658, 659, 593 A.2d 424, 428, 429 (1991) (quoting *Sprague*, 520 Pa. at 44, 550 A.2d at 187).

The *Rizzo* Court allowed a taxpayer to challenge in equity a decision of the board of pensions and retirement to pay pension benefits to a former police commissioner because no party to the pension proceeding was aggrieved by the decision and therefore would not challenge the decision.[3] In the matter sub judice, the University is the party beneficially affected by misinterpretation of the 1977 ordinances, and it is patently obvious that the University will not challenge an interpretation that enures to its benefit. *Sprague.* Because Objectors have established a causal connection between their interests and the complained of action, Objectors have standing to bring this equity action under the 1977 ordinances.

This Court has recently recognized that parents have a substantial and protectable interest in their rights to ensure express parental consent prior to commencement of a program of condom distribution within the School District of Philadelphia. *Parents United for Better Schools, Inc. v. Sch. Dist. of Philadelphia*, —— Pa.Commonwealth Ct. ——, 646 A.2d 689 (1994). The Court rejected arguments that the objecting parents did not have standing because their interests were shared by all parents of children in Philadelphia schools and observed that: "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *Id.* at ——, 646 A.2d at 692 (*quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)). I would therefore allow Objectors to proceed with their petition for an injunction and special

---

3. *Cf. In re Hoover*, 147 Pa.Commonwealth Ct. 475, 484, 608 A.2d 607, 611 (1992) (property owners who reside in a flood plain in close proximity to a proposed land use had standing to challenge the misinterpretation of an ordinance because, inter alia, "[t]o hold otherwise, would allow municipalities to avoid public challenge and ignore regulatory prohibitions"). An associ-

ation may have standing as the representative of its members if the association alleges that at least one of its members has or will suffer direct, immediate and substantial injury as a result of the challenged action. *National Solid Wastes Management Assn. v. Casey*, 135 Pa.Commonwealth Ct. 134, 580 A.2d 893 (1990).

relief because of their standing as third-parties beneficiaries and as taxpayers.

## III

The trial court erred in its interpretation of the 1977 ordinances regarding the number and frequency of mayor's scholarships to be awarded. The court relied upon an interpretation of the 1977 ordinances provided by the city solicitor, Judith Harris, and determined that because the University and the City never intended the University's obligation to be greater than that stated by Harris, the 1977 ordinances require 125, four-year, full tuition scholarships or their equivalent so that at any given point in time there would be 125 mayor's scholarships or their equivalent.[4] The court also concluded that the University has underfunded its obligations under the 1977 ordinances by failing to give full-tuition scholarships to all of the mayor's scholars and awarding scholarships to students who graduated from schools located outside of Philadelphia.

Statutory construction principles are applicable when construing local ordinances, *Patricca v. Zoning Bd. of Adjustment of Pittsburgh*, 527 Pa. 267, 590 A.2d 744 (1991), and the intent of the governing body which enacted the ordinance is of primary concern. Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a), (b) and (c)(7–8); *Tobin v. Radnor Twp. Bd. of Comm'rs*, 142 Pa.Commonwealth Ct. 567, 597 A.2d 1258 (1991). A court may not ignore the plain language and history of an ordinance, *In re Hoover*, 147 Pa.Commonwealth Ct. 475, 608 A.2d 607 (1992); and an ambiguity exists when language is subject to two or more reasonable interpretations and not merely because two conflicting interpretations may be suggested. *New Castle County v. Hartford Accident & Indem. Co.*,

970 F.2d 1267 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993).[5]

The trial court did not determine that all of the provisions in the 1977 ordinances were ambiguous. Rather, the court relied upon *Pennsylvania Liquor Control Board v. Burrell Food Systems, Inc.*, 97 Pa.Commonwealth Ct. 101, 508 A.2d 1308 (1986), *appeal denied*, 513 Pa. 636, 520 A.2d 1386 (1987), and erroneously determined that it was "bound to give great deference to administrative interpretation"; noted that Harris was the only city solicitor to issue a written opinion on the matter; and concluded that based on Harris' opinion, the University's obligation was only to establish and maintain 125 four-year, full-tuition scholarships, or their equivalent, so that at any point in time there will be 125 mayor's scholars receiving full tuition under the program.

While the duties of a city solicitor include interpreting and preparing ordinances and furnishing legal advice to the mayor and city council, *see* 351 Pa.Code § 4.4–400, the trial court erred in giving Harris' opinion the same deference and weight which are accorded an administrative agency's interpretation of a statute the agency is charged to execute and apply. Such deference and weight are accorded to an administrative agency's interpretation only where the statutory language is not explicit or is ambiguous and the agency's interpretation is not clearly erroneous. *Burrell Food Systems*. Moreover, the fact that city council rejected the city solicitor's proposed amendment to the 1977 ordinances further demonstrates that no legal basis existed for the trial court to bind itself to the city solicitor's opinion.

---

4. The University presented to the trial court a draft of Bill No. 66 which Harris forwarded to John F. Street, city council president. The draft ordinance contained language which Harris proposed to amend the 1977 ordinances "so as to eliminate any alleged uncertainty." The word "annually" was deleted in the draft. Harris appeared before city council during its deliberations on the proposed bill at which time Harris attempted to explain her interpretation of the 1977 ordinances. City council reviewed Bill No. 66 and refused to enact it.

5. Preambles to ordinances may be considered in the construction thereof. 1 Pa.C.S. § 1924; *Bundy v. Belin*, 501 Pa. 255, 461 A.2d 197 (1983). Words and phrases are to be construed according to the rules of grammar and their common and approved usage, 1 Pa.C.S. § 1903(a), and undefined terms must be given their plain, ordinary meaning. *Federici v. Borough of Oakmont Zoning Hearing Bd.*, 136 Pa.Commonwealth Ct. 310, 583 A.2d 15 (1990), *appeal dismissed*, 531 Pa. 454, 613 A.2d 1205 (1992).

The scholarships provided for in the 1977 ordinances were "in lieu of the obligations" under the 1882 and 1910 ordinances which totalled 125 free scholarships (fifty Board of Education scholarships to public school students and 75 mayor's scholarships to students from all of the City's schools). The increased obligations under the 1977 ordinances plainly required that preexisting obligations be changed to 125 four-year, full-tuition scholarships to be awarded annually or every year, so that by the end of a four year period, the University shall have awarded such scholarships to a total of 500 deserving students from Philadelphia schools. This Court's role is to interpret the 1977 ordinances consistent with its plain meaning and relevant rules of statutory construction and it does not have the power to rewrite the 1977 ordinances in order to arrive at a desired result.[6] *Allright Auto Parks, Inc. v. Zoning Board of Adjustment of Philadelphia,* 107 Pa.Commonwealth Ct. 448, 529 A.2d 546 (1987).

For the foregoing reasons, I would reverse the trial court's February 22, 1993 order denying Objectors' petition for injunctive and special relief. The court erred in concluding that Objectors had no standing to bring their equity action and in its interpretation of the 1977 ordinances with respect to the number and frequency of mayor's scholarships to be awarded to deserving graduates of Philadelphia schools. This case should be remanded to the trial court for entry of an order granting appropriate injunctive and/or other relief to ensure the award of scholarships consistent with the terms of the 1977 ordinances, or for additional proceedings, if necessary, before entry of appropriate relief.

DOYLE and FRIEDMAN, JJ., join in this dissent.

---

6. The interpretation presented in the concurring opinion has the effect of rewriting the 1977 ordinances by deleting the word "annually" and inserting the word "available." The concurring judge urges that the 1977 ordinances provide that the Mayor award "available" scholarships annually.